**COURT OF CHANCERY**
OF THE
**STATE OF DELAWARE**

TAMIKA R. MONTGOMERY-REEVES
VICE CHANCELLOR

New Castle County Courthouse
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

Date Submitted: June 14, 2016
Date Decided: August 19, 2016

John G. Harris, Esquire
David B. Anthony, Esquire
Berger Harris LLP
1105 North Market Street
I.M. Pei Building, 11th Floor
Wilmington, DE 19801

Michael J. Maimone, Esquire
Greenberg Traurig LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801

> RE: ***Stephen W. Bomberger v. Benchmark Builders, Inc., et al.***
> Civil Action No. 11572-VCMR

Dear Counsel:

This Letter Opinion addresses the defendants' motion to dismiss the plaintiff's verified complaint. For the reasons stated herein, the defendants' motion is granted in part and denied in part.

## I.    BACKGROUND

In 1988, Plaintiff Steven W. Bomberger co-founded Defendant Benchmark Builders, Inc. ("Benchmark" or the "Company") along with three brothers, Defendants Francis and Richard Julian and non-party Eugene Julian (for simplicity's sake, "Francis," "Richard," and "Eugene"). Bomberger also entered

into an employment agreement with Benchmark, dated October 15, 1988, and purchased 150 shares of Benchmark stock thereunder for $100 per share.

Bomberger, Francis, Richard, and Eugene, as the Company's principal stockholders, entered into the Agreement of the Principal Shareholders of Benchmark Builders, Inc., dated March 2, 1994 (the "Shareholders Agreement"). Under the Shareholders Agreement, only Benchmark employees may hold shares of Benchmark stock, and if a stockholder's employment with Benchmark is terminated for any reason other than death, total disability, or retirement at the age of sixty-two, then the Company has the right to repurchase his Benchmark stock at the lower of either his original purchase price or the stock's current net book value.

In May of 2015, when he was fifty-eight years old, Bomberger's employment with Benchmark was terminated. Later that month, Francis, on behalf of Benchmark's board of directors (the "Board") offered to repurchase Bomberger's shares for $747 per share. Bomberger, however, refused the Board's $747 per share offer and asserted that his shares had a net book value of $3,925.15 per share. As such, on August 28, 2015, Benchmark informed Bomberger that it was exercising its right under the Shareholders Agreement to repurchase his shares for the price he originally paid—*i.e.*, $100 per share.

Thereafter, on October 2, 2015, Bomberger filed his verified complaint (the "Complaint"), asserting four claims against Benchmark, Francis, Richard, William Alexander, William J. DiMondi, Dean C. Pappas, and Kang Development, LLC (collectively, "Defendants"). Defendants then filed a motion to dismiss the Complaint under Court of Chancery Rule 12(b)(6). This Letter Opinion resolves that motion to dismiss.

## II.    ANALYSIS

The standard of review for dismissal pursuant to Rule 12(b)(6) is well established. A motion to dismiss will be denied if the Complaint's well-pled factual allegations would entitle the plaintiff to relief under any reasonably conceivable set of circumstances.[1] The Court accepts all well-pled facts as true and draws all reasonable inferences in favor of the plaintiff.[2] The Court, however, need not accept conclusory allegations unsupported by specific facts or draw unreasonable inferences.[3]

---

[1]    *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.2d 531, 537 & n. 13 (Del. 2011).

[2]    *Id.*

[3]    *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011).

### A. Defendants' Motion To Dismiss Is Partially Granted as to Bomberger's Waiver Claim

In Count I of the Complaint, Bomberger seeks a declaration that Benchmark waived its right under the Shareholders Agreement to repurchase Bomberger's shares for the price he originally paid. Waiver of a contractual right "implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights," and "[t]he facts relied upon to prove waiver must be unequivocal."[4] As such, the Delaware Supreme Court has "held that three elements must be demonstrated to invoke the waiver doctrine: (1) that there is a requirement or condition capable of being waived, (2) that the waiving party knows of that requirement or condition, and (3) that the waiving party intends to waive that requirement or condition."[5] Bomberger relies heavily on this Court's decision in *Julian v. Eastern States Construction Service, Inc.*[6] ("*Julian I*") for his argument that the Company's prior interactions with Eugene in

---

[4]     *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) (citing *Realty Growth Inv'rs v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982)).

[5]     *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 27 A.3d 522, 529-30 (Del. 2011) (citing *Bantum v. New Castle Cty. Vo–Tech Educ. Ass'n*, 21 A.3d 44, 50 (Del. 2011)).

[6]     2008 WL 2673300 (Del. Ch. July 8, 2008) ("*Julian I*").

a related situation resulted in a waiver of its repurchase right under the Shareholders Agreement.

In *Julian I*, the Court addressed a dispute between the three Julian brothers that culminated in Eugene's termination from Benchmark in 2003. Because "by the end of 2003, [Eugene] no longer had a formal relationship with Benchmark other than as a stockholder[,] . . . Benchmark had the right to demand the reacquisition of [Eugene's] Benchmark shares" under the Shareholders Agreement.[7] The Court found, however, that "Benchmark knew of, and intentionally chose not to enforce, this right . . . to demand the buy-back of [Eugene's] Benchmark shares," until late 2005 or early 2006.[8] Specifically, "[a]t a February 10, 2006 Benchmark board of directors meeting, the board decided by a vote of 2-1, with Bomberger dissenting, to waive enforcement of the" provision in the Shareholders Agreement that would have required Eugene to sell his shares at the lesser of his original purchase price and the net book value.[9] Instead, the Board made an "arrangement for the Company to purchase Eugene's shares of stock in the Company based on the year end 2005 net book value," which was significantly

---

[7] *Julian I*, 2008 WL 2673300, at *16.

[8] *Id.*

[9] *Id.* at *5.

higher than the $100 per share price that Eugene had originally paid.[10]  The Court held, therefore, that "Francis and Richard waived their right to insist upon such a resale by knowingly failing to try to enforce that right until December 2005 or later" and allowed Eugene to "retain his stock in Benchmark" despite the Shareholders Agreement's resale obligations.[11]

Bomberger argues that both (1) the Company's delay in seeking to repurchase Eugene's shares (the "2003 Waiver") and (2) the Board's February 10, 2006 express waiver of the Company's right to repurchase Eugene's shares at his original repurchase price (the "2006 Waiver") constitute *permanent* waivers of the Company's right to repurchase Benchmark shares under the Shareholders Agreement at the lower of the original purchase price and the net book value.[12]  As such, Bomberger maintains that "[t]he Company's prior waivers of its putative right to have required [Eugene] to resell his Benchmark stock apply with full force and effect to Bomberger and the resale of his Benchmark Shares."[13]

---

[10]     Compl. ¶¶ 46-47 (alleging a 2005 net book value of $10,964 per share).

[11]     *Id.* at *1.

[12]     Compl. ¶ 89.

[13]     *Id.* ¶ 93.

Bomberger, however, misapplies and misconstrues the Court's decision in *Julian I.* The Court held that Benchmark had waived its right to repurchase Eugene's shares based solely on its "fail[ure] to enforce that claimed right in a timely fashion," as the Company delayed over two years.[14] By contrast, the Board sought to repurchase Bomberger's shares at his original purchase price within three months of his termination. Nothing in the Complaint, therefore, indicates that Benchmark unreasonably delayed in asserting its repurchase right under the Shareholders Agreement. Bomberger's waiver claim, therefore, is flawed because it improperly extends the individualized, fact-specific waiver in *Julian I* to Bomberger's distinct circumstances.[15] Thus, Count I is dismissed with prejudice to the extent that it relies on the 2003 Waiver found in *Julian I.*

Whether the 2006 Waiver itself constitutes a permanent waiver as to Benchmark's ability to repurchase *any* stockholder's shares at the original purchase price, however, is a separate question. The Complaint alleges, and the Court in *Julian I* recognized, that the 2006 Waiver constituted an express waiver of

---

[14] *Julian I*, 2008 WL 2673300, at *17.

[15] *See AeroGlobal Capital*, 871 A.2d at 446 (indicating that a party's "conduct under the circumstances" should be evaluated to determine whether they "evidenced an intentional, conscious and voluntary abandonment of [their] claim or right").

a portion of the Shareholders Agreement.[16]  But, the Complaint does not include any allegations regarding whether the Board, at the time of the 2006 Waiver, intended to extend that waiver to all Benchmark stockholders, or solely to Eugene. Because, however, the Complaint adequately alleges that the 2006 Waiver constituted an express waiver, this aspect of Count I is dismissed without prejudice.[17]

### B.     Defendants' Motion To Dismiss Is Partially Granted as to Bomberger's Fiduciary Duty Claim

In Count II of the Complaint, Bomberger asserts a claim against the Board—consisting of Francis, Richard, Alexander, DiMondi, and Pappas—for breach of fiduciary duty.  Bomberger advances two bases on which the Board purportedly breached its fiduciary duties.  First, Bomberger contends that "the Benchmark Board terminated his employment due to his age in order to deprive him of his ability to resell his shares to Benchmark at their net book value under . . . the Shareholders Agreement."[18]  According to Bomberger, his termination constituted

---

[16]     *See* Compl. ¶ 91 ("Francis and Richard (i) caused the Company to waive its putative right to repurchase [Eugene's] shares at the price he originally paid for his shares . . . and (ii) authorized the Company to repurchase [Eugene's] Benchmark stock based on the then-current 2005 net book value of his shares."); *Julian I*, 2008 WL 2673300, at *5 (same).

[17]     *See* Ct. Ch. R. 15(aaa).

[18]     Pl.'s Answering Br. 22.

a fiduciary duty breach because (1) as a discriminatory action, it was a violation of positive law, which "amounts to bad faith and a breach of the duty of loyalty,"[19] and (2) "[t]he Benchmark Board's disparate treatment of Bomberger was motivated by the remaining Julian family members, who collectively comprise a controlling majority of Benchmark's issued and outstanding stock."[20] The parties note, however, that Bomberger currently is pursuing an age-based discrimination claim before the Equal Employment Opportunity Commission (the "EEOC") against Benchmark.[21] Because Bomberger's fiduciary duty claim presumes the unlawfulness of his termination, the EEOC's resolution of his age-based discrimination claim bears directly on his claim. Thus, I dismiss this portion of Count II without prejudice as to Bomberger's ability to reassert that claim pending the resolution of the EEOC action.

Second, the Complaint alleges that Francis and Richard "caus[ed] the issuance of new Benchmark shares to the [younger members of the Julian family], which diluted the per share value of the minority shareholders' stock," but did not

---

[19]     *Id.* at 21 (citing *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006)).

[20]     Compl. ¶ 99.

[21]     *See* Defs.' Opening Br., Ex. C.

dilute their own stock.[22]  In their opening brief, Defendants dispute whether those issuances constituted fiduciary duty breaches.[23]  Bomberger, however, did not pursue this aspect of his fiduciary duty claim in his brief.  Instead, at oral argument, Bomberger's counsel simply stated that "one of the claims that Mr. Bomberger makes in Count II is that the Benchmark board took the affirmative step to take dilutive action, action which effectively diluted Mr. Bomberger and other minority-member shareholders of the company."[24]  That conclusory statement alone is insufficient to maintain that aspect of Bomberger's fiduciary duty claim.[25]  And, even if Bomberger had pursued this claim with more vigor, I note that the Complaint refutes these allegations by indicating that Bomberger actually was given the opportunity to participate in Benchmark's subsequent equity

---

[22]   Compl. ¶ 64.

[23]   Defs.' Opening Br. 11-12.

[24]   Oral Arg. Tr. 33.

[25]   *See CNB-AB LLC v. E. Prop. Fund I SPE (MS Ref) LLC*, 2011 WL 353529, at *10 n.98 (Del. Ch. Jan. 28, 2011) (finding claims waived where a plaintiff "failed meaningfully to brief or argue them" (citing *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999))).

offerings.[26] Thus, I grant Defendants' motion to dismiss as to this portion of Count II.

### C. Defendants' Motion To Dismiss Is Denied as to Bomberger's Promissory Estoppel Claim

In Count III of the Complaint, Bomberger contends that Benchmark is required, under the doctrine of promissory estoppel, to pay Bomberger the net book value for his shares rather than his original purchase price. To prevail on his claim for promissory estoppel, Bomberger must, through clear and convincing evidence, satisfy the following four elements:

> (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.[27]

I conclude that the Complaint pleads sufficient facts from which I may infer that Bomberger's promissory estoppel claim is reasonably conceivable.

---

[26] *See* Compl. ¶ 105 (noting that Benchmark granted Bomberger stock options in 2011, 2012, and 2013).

[27] *Harmon v. Del. Harness Racing Comm'n*, 62 A.3d 1198, 1201 (Del. 2013) (quoting *Lord v. Soulder*, 748 A.2d 393, 399 (Del. 2000)).

First, the Complaint alleges a number of promises that Francis made to Bomberger regarding both Bomberger's employment status,[28] and the Board's intention, at all times, to pay Bomberger the net book value of his shares.[29]

Second, Francis reasonably should have expected that his promise would induce forbearance on Bomberger's part because Bomberger allegedly had lobbied the other parties to the Shareholders Agreement to amend that Agreement to remove the provision requiring that, if Benchmark repurchased a stockholder's shares, it would do so at the lower of the two prices.[30] Notably, in an April 22, 2013 email to DiMondi, Bomberger stated that he and Francis had spoken a number of times regarding an amendment to the Shareholders Agreement.[31] And, the Complaint expressly alleges that Francis made his promise to Bomberger "[i]n

---

[28]   *E.g.*, Compl. ¶ 14 (alleging that Francis told Bomberger that "the Benchmark Board would never terminate his employment without cause and force him to resell his shares at the original-purchase-price-value").

[29]   *E.g.*, *id.* ¶ 108 (alleging that Francis represented to Bomberger that "the Benchmark Board would never invoke" its right under the Shareholders Agreement to repurchase Benchmark shares at the original purchase price "as to Bomberger or any other Principal Shareholder whose employment was terminated without cause").

[30]   *Id.* ¶ 58.

[31]   *Id.* ¶ 60.

response to Bomberger's frequent pleas for a formal amendment to" the Shareholders Agreement and "to alleviate Bomberger's growing concern."[32]

Third, Bomberger relied on Francis's promise to his detriment by "declin[ing] to sign the proposed Amended and Restated [Shareholders] Agreement" and by "suspend[ing] his efforts to amend the Shareholders Agreement, at least until the Julian Brothers reached a resolution [to] remove [Eugene's] veto power."[33] Although the proposed amendment would have amended the Shareholders Agreement as Bomberger requested, he declined to execute that Agreement because he was concerned that excluding Eugene from the amendment "may run afoul of state law."[34] Even if the Shareholders Agreement could not have been amended without Eugene's consent, the Board arguably could have elected to repurchase Bomberger's shares at the net book value over Eugene's objection, as it did in the 2006 Waiver over Bomberger's objection.[35] And, although Francis was only one director on the five-member Board, the Complaint alleges that (1) "Francis and Richard systematically used their voting control to

---

[32]      *Id.* ¶ 58.

[33]      *Id.* ¶ 115.

[34]      *Id.* ¶ 60.

[35]      *Id.* ¶¶ 4, 91.

dominate" the Board, (2) "Francis's assurances carried the weight and authority of the Benchmark Board, which he had dominated for many years," and (3) "Francis's assurances were consistent with" the 2006 Waiver.[36]

Fourth, the Complaint's allegations, taken as true, indicate that injustice only can be avoided if Francis's promises are enforced because, absent such enforcement, Bomberger will be deprived of the alleged $3,925.15 per share net book value of his Benchmark stock and instead will be forced to accept $100 per share.[37] Defendants respond that Francis only promised not to force Bomberger to resell his shares at his original purchase price,[38] and that Benchmark complied with that promise by offering to repurchase Bomberger's stock for $747 per share.[39] Yet, that argument ignores the fact that the Shareholders Agreement contemplates only two possible repurchase prices for an employee's stock: (1) the original purchase price or (2) the net book value. It is reasonably conceivable, therefore, that when Francis promised that the Company would never force Bomberger to resell his shares at his original purchase price, both Francis and Bomberger

---

[36]    *Id.* ¶¶ 3, 114.

[37]    *Id.* ¶ 73.

[38]    *Id.* ¶ 14.

[39]    *Id.* ¶ 72.

understood that meant that the Company would repurchase it at the net book value.

Thus, I deny Defendants' motion to dismiss as to Count III.

### D. Bomberger's Claim Against Kang Development, LLC Is Dismissed Without Prejudice

Finally, in Count IV of the Complaint, Bomberger seeks specific performance of an agreement related to Kang Development, LLC. Because the parties agree that Kang Development, LLC already has satisfied Bomberger's request, I dismiss Count IV without prejudice.[40]

## III. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted in part and denied in part.

**IT IS SO ORDERED.**

Sincerely,

*/s/Tamika Montgomery-Reeves*

Vice Chancellor

TMR/jp

---

[40] Oral Arg. Tr. 12 (indicating that both parties agree that "Count IV should be dismissed without prejudice").