Mahyar AMIRSALEH, Plaintiff–
Below, Appellant,

v.

BOARD OF TRADE OF the CITY OF
NEW YORK, INC., and Intercontinen-
tal Exchange, Inc., Defendants–Below,
Appellees.

No. 75, 2010.

Supreme Court of Delaware.

Submitted: May 25, 2011.

Decided: Aug. 16, 2011.

Reargument Denied Sept. 12, 2011.

Elizabeth M. McGeever, Esquire, of Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Of Counsel: Jonathan S. Shapiro, Esquire (argued), Robert J. Shapiro, Esquire, and Kerry C. Foley, Esquire, of The Shapiro Firm, LLP, New York, New York, for Appellant.

Donald J. Wolfe, Jr., Esquire (argued), Michael A. Pittenger, Esquire, and Berton W. Ashman, Jr., Esquire, of Potter Anderson & Corroon LLP, Wilmington, Delaware, for Appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice:

Defendants–Below/Appellees, Intercontinental Exchange, Inc. and the Board of Trade of the City of New York, Inc. (collectively, the "Defendants"), merged in 2007. Plaintiff–Below/Appellant, Mahyar Amirsaleh, was a member of the Board of Trade before the merger. The merger agreement required that if a member, including Amirsaleh, wished to continue in the newly merged enterprise, the member had to submit an Election Form specifying that preference by a stated deadline. Amirsaleh did not receive the Election Form until after the deadline had passed. Thereafter, the Defendants learned that many members, including Amirsaleh, had failed to submit the Election Form. The Defendants debated whether or not to waive the deadline and ultimately did so. Then, in an *ad hoc* manner and without notice to any member, the Defendants imposed a new deadline. The Defendants decided that the Election Form that Amirsaleh had submitted was untimely. Of all the post-deadline-filed Forms, Amirsaleh's Form was the only one that the Defendants deemed untimely and refused to honor.

Thereafter, Amirsaleh filed this action alleging breach of contract. The Court of Chancery ruled in favor of the Defendants. We conclude from the undisputed facts that the Defendants waived the initial deadline and also failed to retract that waiver by providing reasonable notice of their new deadline. Because the retraction of the waiver was invalid as a matter of law, Amirsaleh's Election Form was timely. The judgment of the Court of Chancery is reversed and the matter is remanded for further proceedings consistent with this Opinion.

### The Parties

Intercontinental Exchange, Inc. ("ICE") is a Delaware corporation that operates regulated exchanges, trading platforms, and clearing houses. The Board of Trade of the City of New York, Inc. ("NYBOT"), which post-merger was named ICE Futures U.S., Inc., is a Delaware corporation

and wholly owned subsidiary of ICE. NYBOT also operates as a commodities exchange and offers trading in futures and options. Before the merger of those entities, NYBOT was a member-owned, New York not-for-profit corporation. Ownership interests in that corporation were represented by exchange memberships. Amirsaleh is an individual who owned two membership interests in NYBOT. Those membership interests gave Amirsaleh the right to trade on NYBOT's exchange.

### The Merger Agreement and Election Form

On September 14, 2006, NYBOT entered into an Agreement and Plan of Merger (the "Merger Agreement") with ICE and ICE's wholly owned subsidiary, CFC Acquisition Co. ("CFC"). The Merger Agreement provided that NYBOT's predecessor would be merged with and into CFC (the "Merger").

The Merger Agreement provided that each NYBOT membership interest ("Membership Interest") would be converted into either 17,025 newly issued shares of ICE common stock or $1,074,719 in cash, or some combination of shares and cash. The Merger Agreement also provided that each NYBOT member ("NYBOT Member") was permitted to elect the form of consideration the member preferred to receive. But, the Merger Agreement fixed the total amount of cash that ICE would pay in connection with the Merger at $400 million. If the available cash consideration was either over- or under-subscribed, the Merger Agreement provided for a *pro rata* reallocation. The Merger Agreement also importantly provided that if a NYBOT Member failed to elect the form of consideration he preferred to receive, that NYBOT Member would automatically receive the form of consideration that was undersubscribed.

The Merger Agreement also provided the procedure by which NYBOT Members could make their elections: An election form ("Election Form") would be mailed to NYBOT Members. The Election Form would allow each NYBOT Member to specify which form of consideration—stock or cash—the member preferred to receive. A NYBOT Member also could refrain from indicating a preference and instead receive whatever form of consideration that the *pro rata* reallocation required. The Merger Agreement further provided that to effect an election of stock or cash, the exchange agent—here, Computershare—had to receive the Election Form by a specific date and time (the "Election Deadline"), which was defined as "on or before 5:00 p.m. on the fifth day before the NYBOT Members Meeting (or such other time and date as ICE and NYBOT may mutually agree)." If the Election Form was not received by the Election Deadline, the Merger Agreement provided that the relevant Membership Interests would be treated as if the NYBOT Member had made no election ("No Election Shares").[1]

Six days after the parties executed the Merger Agreement, ICE publicly filed that document with the Securities and Exchange Commission ("SEC"). Approximately two months later, ICE and NYBOT

---

**1.** The Election Form was not the only document that NYBOT Members were required to submit. NYBOT's post-Merger bylaws provided that any NYBOT Member who wished to retain trading rights in the new enterprise was required to: (1) own at least 3,162 shares of ICE common stock after the Merger, and (2) pledge those shares in accordance with a NYBOT Membership and Pledge Agreement and Pledge Addendum (the "Pledge Agreement"). The Pledge Agreement was due no later than February 1, 2007. In sum then, NYBOT Members needed to complete and timely submit both an Election Form and a Pledge Agreement to continue in the new enterprise.

filed a definitive joint proxy statement and prospectus (the "Proxy Statement/Prospectus") with the SEC. Copies of the Proxy Statement/Prospectus were mailed to all NYBOT Members. The Election Form was not mailed at that time, but the Proxy Statement/Prospectus advised NYBOT Members that the Election Form would follow in a subsequent mailing. The Proxy Statement/Prospectus also advised NYBOT Members that the exact date and time of the Election Deadline would be disclosed in that mailing. Amirsaleh received the Proxy Statement/Prospectus and returned his proxy, voting in favor of the Merger, on November 28, 2006. The Merger was ultimately approved on December 11, 2006.

### Suboptimal Process

In early- or mid-December, Amirsaleh instructed his executive assistant, Donna Stavrinou, to follow up with NYBOT Member Services regarding the Merger. NYBOT Member Services told Stavrinou that the Election Forms would be mailed soon. On December 19, 2006, the Election Forms were mailed to NYBOT Members at their addresses of record. Amirsaleh did not receive the Election Form in the mail. Although the Merger Agreement and Proxy Statement/Prospectus did not identify a specific date for the Election Deadline, the first page of the Election Form provided: "ELECTION DEADLINE: JANUARY 5, 2007." The third page of the Election Form further stated:

Election Deadline. To be effective, an election on this election booklet must be properly completed, signed, delivered to and received by [Computershare] no later than the Election Deadline. All elections will be irrevocable after 5:00 p.m., New York City time, on the Election Deadline, which is January 5, 2007. NYBOT Members and NYBOT Member Firms whose election booklets are not so received will not be entitled to specify their preference as to the form of merger consideration that they may receive and will be deemed to have made a "no election" with respect to their NYBOT Membership Interests....

When the Defendants learned that some NYBOT Members, including Amirsaleh, had not submitted the Election Form by the January 5, 2007 Election Deadline (the "Initial Deadline"), the Defendants hesitated in deciding whether to continue accepting Election Forms. The Defendants initially decided not to accept Election Forms after the Initial Deadline, unless the NYBOT Member could show that the Defendants caused the delay, such as by (for example) mailing the Election Form to the wrong address. The Defendants then considered whether the Initial Deadline should be extended to January 8, because mail service was suspended on January 2 for the National Day of Mourning (recognizing President Ford's passing). On January 9, the Defendants decided not to extend the Initial Deadline because they had not received any Election Forms in the mail the previous day. But, during the next few days the Defendants received several Election Forms from NYBOT Members who complained about the process and threatened to sue if their Election Forms were not honored. The Defendants maintained a list of those complaints, for the apparent purpose of analyzing whether any of them had merit. The Defendants eventually decided not to use that list.

The Merger then closed on January 12—one week after the Initial Deadline. After the Merger closed, there was a limited period of time available to process the data contained in the Election Forms. The Merger Agreement provided that, within ten business days after the closing of the Merger, ICE was contractually obligated to "cause [Computershare] to effect

the allocation among the Members of rights to receive ICE Common Stock and/or cash in the Merger in accordance with the Election Forms" and the Merger Agreement's allocation and proration provisions. The Merger consideration was to be distributed by January 29, 2007.

Five days after the Merger closed, on January 17, the ICE legal team concluded that the Defendants should waive the Initial Deadline and continue to accept Election Forms. ICE Chairman and CEO Jeffrey Sprecher primarily drove that decision, intending to accommodate as many late Election Forms as possible. In a 3:11 p.m. email to Linda Chin of NYBOT Member Services, Donnie Amado of Computershare sought to achieve that objective by attaching a spreadsheet that listed all fifty-one NYBOT Members (including Amirsaleh) who had not yet submitted Election Forms. Chin used that list to contact those NYBOT Members. Chin called Amirsaleh's office and left a message.

The next morning (January 18), Chin called Amirsaleh's office again and left another message. That afternoon, at 4:40

p.m., Stavrinou returned Chin's call and learned that Amirsaleh had to submit an Election Form to continue in the new enterprise.[2] Stavrinou informed Chin that Amirsaleh was traveling. Amirsaleh's travel itinerary reflects that he was scheduled to be in flight from Newark, New Jersey to Las Vegas, Nevada from 4:25 p.m. to 10:18 p.m. In a 4:50 p.m. email to Amirsaleh and Stavrinou, Chin attached an electronic version of the Election Form and wrote: "In the attempt to save your Memberships, please complete attached and fax a copy to Computershare . . . and overnight the original to Computershare. . . ." Chin also added: "I cannot guarantee that his booklet will be accepted."

Three hours later, Computershare received the last Election Form that the Defendants deemed timely. That Form was submitted by Kevin Davis.[3] Although Davis attached his Election Form in a 5:20 p.m. email to NYBOT Member Services, that Form was not technically "received" until NYBOT Member Services forwarded Davis' email to Computershare at 7:38 p.m. Even then, Davis's Election Form was de-

2. Chin and Stavrinou had spoken over the phone six days earlier when Chin was instructed to contact NYBOT Members who had not yet submitted a Pledge Agreement. Because the Defendants had not yet decided whether to continue to accept Election Forms, Chin only discussed the topic of Election Forms if the NYBOT Member specifically referred to it, even though the Proxy Statement/Prospectus provided that the Election Form would be available to any NYBOT Member "upon such NYBOT [M]ember's reasonable request." An apparently confused Stavrinou asked Chin for "anything related to the [M]erger," because Amirsaleh had received nothing. But, Chin only told Stavrinou that Amirsaleh needed to complete the Pledge Agreement to maintain his membership. Chin then faxed the Pledge Agreement to Stavrinou, and Amirsaleh timely submitted it. The record reflects that Chin spoke with

other NYBOT Members on that day, encouraging them to submit the Election Form. Chin recalled: "Some of them [were] clueless, and I [told] them [ ] what's going on, and I brought up the election booklet."

3. The record reflects that Davis called ICE Chairman and CEO Jeffrey Sprecher on one of the few days after January 12, 2007. Sprecher knew Davis was a large ICE customer and the CEO of one of the world's largest commodity exchange clearing firms. Although Davis did not call to discuss Election Forms, Sprecher initiated a conversation about that topic. Sprecher asked Davis if he had submitted his Election Form before the Initial Deadline. Davis did not know. Sprecher advised Davis to submit the Election Form if he had not already done so.

ficient in several respects.[4]

Amirsaleh faxed his completed Election Form, in which he elected to receive 100% stock for each of his two NYBOT Membership Interests, to Computershare the next day (January 19), at approximately 2:06 p.m., which was 11:06 a.m. in Las Vegas. Then, approximately one hour later, Davis corrected a deficiency in his earlier submission.[5]

Despite the fact that the proration and allocation process was delayed until January 22 (at the earliest),[6] the Defendants treated Amirsaleh's submission on January 19 as untimely, and deemed Amirsaleh's Membership Interests as "No Election Shares." Because the cash component of the Merger consideration was sufficiently undersubscribed, each "No Election Share" received all cash consideration. Consequently, Amirsaleh lost his NYBOT trading rights and did not receive any shares of ICE common stock in exchange for his NYBOT Membership Interests.

### Procedural History

Amirsaleh filed this action in the Court of Chancery, alleging that the Defendants had breached their obligations under the Merger Agreement and the implied covenant of good faith and fair dealing. Amirsaleh asked the Court of Chancery to order the Defendants to issue to him shares of ICE in the same amount, and on the same terms and conditions, as were issued to other NYBOT Members who had elected to receive stock consideration in the Merger, and to reinstate his two Membership Interests. Thereafter, the Court of Chancery issued three Memorandum Opinions.[7]

4. Pursuant to the Election Form instructions, an election could be made by: (1) providing the name and address of the holder of the NYBOT Membership Interests, as well as the number of NYBOT Membership Interests, in a specified box, (2) completing a tax form, and (3) returning the Election Form to Computershare. Davis failed to provide his name, address, and number of Membership Interests in the specified box. Davis also failed to complete the tax form. Finally, Davis sent the Election Form to NYBOT Member Services, instead of Computershare.

5. In a January 18 email, NYBOT Managing Director of Member Services Helene Recco advised Davis that he might need to complete an additional tax form and that Recco could provide that form if necessary. On January 19, at 9:25 a.m., Donnie Amado of Computershare replied to Recco's email, stating that the Election Form "need[ed] to be filled out completely and overnighted to [Computershare] with the [tax form]." In a 2:04 p.m. email to Davis's assistant, Recco wrote: "Please have the attached [tax form] completed and faxed to Computershare...." Davis's office finally faxed the tax form to Recco—not Computershare—at 3:10 p.m. on January 19.

6. The record reflects this delay. On January 19, at 4:47 p.m., Amado emailed Recco, writing: "Are you still in? Please call me asap...." The next day (January 20) at 8:10 a.m., Recco emailed Amado, writing: "I was unable to open the email with the spreadsheet. I confirmed the message and asked for the release but I have not received it yet. I'll call later if I still have a problem." At 8:57 a.m., Amado replied to Recco and copied ICE Assistant General Counsel Andrew Surdykowski. Amado attached a spreadsheet that provided the information for proration and allocation of the shares. Amado instructed Recco to fill in two additional columns in that spreadsheet before Computershare could "start crediting the shares." Amado also asked Surdykowski to "work with" Recco. In a different set of email exchanges, Amado sent Recco a spreadsheet on January 19, at 6:57 p.m. Recco replied on January 22, at 4:44 a.m., stating: "I can't open this file. I'll call you later this morning."

7. *Amirsaleh v. Bd. of Trade of City of New York, Inc. (Amirsaleh I),* 2008 WL 4182998 (Del.Ch. Sept. 11, 2008); *Amirsaleh v. Bd. of Trade of City of New York, Inc. (Amirsaleh II),* 2009 WL 3756700 (Del.Ch. Nov. 9, 2009); *Amirsaleh v. Bd. of Trade of City of New York, Inc. (Amirsaleh III),* 2010 WL 177681 (Del. Ch. Jan. 19, 2010).

In *Amirsaleh I*,[8] the Court of Chancery determined that although Amirsaleh was not a party to the Merger Agreement, he nevertheless had standing to bring this action because NYBOT Members were explicitly and intentionally granted meaningful benefits in the contract.[9] The Court of Chancery then addressed Amirsaleh's argument that the Defendants breached the Merger Agreement by improperly deciding that his Election Form was untimely. The Court of Chancery rejected that argument, explaining:

> According to the Election Form, the deadline was set for January 5, 2007. That clear pronouncement notwithstanding, the record demonstrates that the [D]efendants accepted the apparently late [E]lection[ ] [Forms] of twenty-five NYBOT members between January 5 and 18. Defendants retort with the argument that they set a second, later deadline of January 18, 2007. Although, as noted above, the evidence in the record is far from clear that NYBOT and ICE affirmatively set January 18, 2007, as the authoritative and final deadline, the evidence is clear that no elections were accepted as timely after that date. Thus, there is no genuine issue of material fact as to whether or not ICE and NYBOT "mutually agree[d]" to stop accepting elections pursuant to section 4.3(b) of the Merger Agreement at some point after January 17 but before Amir-

saleh submitted his form on January 19.[10]

In accordance with that analysis, the Court of Chancery granted the Defendants' motion for summary judgment on the claim for breach of the Merger Agreement.[11] But, the Court of Chancery denied the Defendants' motion for summary judgment on the implied covenant of good faith and fair dealing claim.[12] In *Amirsaleh II*,[13] the Court of Chancery likewise denied Amirsaleh's motion for summary judgment on the implied covenant of good faith and fair dealing claim because Amirsaleh had failed to demonstrate the absence of a genuine issue of material fact.[14]

Thereafter, the Court of Chancery held a three-day trial to determine whether bad faith had motivated the Defendants' decision to accept Election Forms in an *ad hoc* manner after the Initial Deadline.[15] In a post-trial Memorandum Opinion—*Amirsaleh III*[16]—the Court of Chancery found that the entire process could have been much better organized, describing it as "haphazard" and "somewhat disjointed."[17] The Court of Chancery also found that the decision not to accept Election Forms after January 18, was made "in the moment," most likely during the evening of January 18, or the morning of January 19—approximately two weeks after the Initial Deadline.[18] The Court of Chancery found that the Defendants made that decision after consulting with Computershare,[19] but that

8. 2008 WL 4182998 (Del.Ch. Sept. 11, 2008).

9. *Id.* at *4–5.

10. *Id.* at *7.

11. *Id.* at *5–7.

12. *Id.* at *7–9.

13. 2009 WL 3756700 (Del.Ch. Nov. 9, 2009).

14. *Id.* at *5–6.

15. *Amirsaleh III*, 2010 WL 177681, at *1.

16. 2010 WL 177681 (Del.Ch. Jan. 19, 2010).

17. *Id.* at *3.

18. *Id.*

19. *Id.* The Court of Chancery found that email correspondence between the Defendants and Computershare demonstrated that they never determined exactly how much time Computershare needed to calculate and distribute the

the exact time of that decision could not be determined.[20] The Court of Chancery ruled in the Defendants' favor, concluding that the Defendants made a good faith attempt to accommodate all NYBOT Members who had not submitted Election Forms by the Initial Deadline.[21] This appeal followed.

On appeal, Amirsaleh argues, among other things, that "the clear purpose of the [E]lection [D]eadline was to give notice to NYBOT [M]embers of the time and date by which they had to submit their [E]lection [F]orms," and that the "Defendants' failure to communicate the [E]lection [D]eadline undermined that purpose and deprived [Amirsaleh] of information critical to his ability to ensure he submitted an [E]lection [Form] that would be honored." Amirsaleh contends that the Court of Chancery erred in concluding that his Election Form was untimely.

### Analysis

■ We review the Court of Chancery's conclusions of law *de novo*,[22] and that Court's factual findings with a high level of deference.[23] We will not set aside the Court of Chancery's factual findings "unless they are clearly wrong and the doing of justice requires their overturn."[24] Although the parties have primarily focused upon the implied covenant of good faith and fair dealing, we decide this case on an alternative ground raised by Amirsaleh: that the Defendants "failed to set and communicate a new [E]lection [D]eadline." That argument is more properly cast in terms of waiver.

### Initial Deadline Waived

■ It is well settled in Delaware that a party may waive contractual requirements or conditions.[25] But, the standards for demonstrating waiver—the voluntary and intentional relinquishment of a known right—are "quite exacting."[26] "[The doctrine] implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those [ ] rights."[27] Furthermore, the facts relied upon to demonstrate waiver must be unequivocal.[28] Applying those principles, we have held that three elements must be demonstrated to invoke

merger consideration by the January 29 distribution deadline. *Id.* The Court of Chancery found that the Defendants could have been more diligent in that respect. *Id.*

20. *Id.* at *3 n. 13. On January 19, at 10:26 a.m., Donnie Amado of Computershare sent an email to ICE Assistant General Counsel Andrew Surdykowski and Helene Recco of NYBOT Member Services. Amado wrote: "Attached is the list of holders that have not came [sic] in. Andrew please confirm that the last election we are accepting is Mr. Davis." Recco forwarded that email to NYBOT's General Counsel Audrey Hirschfield at 1:48 p.m. At some point in time on January 19, Surdykowski confirmed that Davis's Election Form would be the last timely submission.

21. *Id.* at *9.

22. *Stegemeier v. Magness*, 728 A.2d 557, 561 (Del.1999) (citing *Emmons v. Hartford Under-*

*writers Ins. Co.*, 697 A.2d 742, 744 (Del. 1997)).

23. *Montgomery Cellular Holding Co., Inc. v. Dobler*, 880 A.2d 206, 219 (Del.2005) (citing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114 (Del.1994)).

24. *Id.* (citing *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del.1972)).

25. *Bantum v. New Castle Cnty. Vo–Tech Educ. Ass'n*, 21 A.3d 44, 50 (Del.2011) (citing *Aero-Global Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del.2005)).

26. *Id.*

27. *Id.*

28. *Id.*

the waiver doctrine: (1) that there is a requirement or condition capable of being waived, (2) that the waiving party knows of that requirement or condition, and (3) that the waiving party intends to waive that requirement or condition.[29]

■ The record in this case reflects that all three of those elements were clearly established. The Initial Deadline to submit Election Forms was a condition capable of being waived. The Merger Agreement and Election Form specifically informed the parties of the consequence of failing to satisfy that condition: "NYBOT Members ... whose [E]lection [Forms] are not [ ] received [by the Initial Deadline] will not be entitled to specify their preference as to the form of [M]erger consideration that they may receive...." The Defendants knew of that condition. Throughout the entire "suboptimal process," the Defendants debated whether to waive the Initial Deadline and continue to accept Election Forms. Then, the Defendants finally decided to waive the Initial Deadline in an effort to accommodate NY-

BOT Members who had not submitted an Election Form by the Initial Deadline. The Defendants' intent to do so was unmistakably clear.

### Waiver Not Retracted

■ A waiving party typically is prohibited from retracting its waiver if the non-waiving party has suffered prejudice or has relied to his detriment on the waiver.[30] By the same token, the waiving party may retract the waiver by giving reasonable notice to the non-waiving party before that party has suffered prejudice or materially changed his position.[31]

Here, the Defendants waived the Initial Deadline. Chin's warning to Amirsaleh ("I cannot guarantee that his booklet will be accepted.") did not operate to retract that waiver, because the Defendants never gave Amirsaleh, or any other NYBOT Member, reasonable notice of their new election deadline. Instead, the Defendants engaged in an *ad hoc,* "suboptimal process" to establish that new deadline retroactively. As a result, Amirsaleh suffered the

---

29. *Id.* at 50–51.

30. *Bailey v. State,* 525 A.2d 582, 1987 WL 37178, at *2 (Del.1987) (TABLE) ("[I]t does not appear that the State has changed position or suffered specific prejudice as a result of defendant's attempted withdrawal of the waiver."); *Roam–Tel Partners v. AT&T Mobility Wireless Operations Holdings Inc.,* 2010 WL 5276991, at *9 (Del.Ch. Dec. 17, 2010) ("Our courts ... look to whether the non-waiving party has been prejudiced by the waiving party's attempt to rescind its prior waiver.") (citations omitted); 13 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 39:20 (4th ed.) ("Under general principles of contract law, a party who has made a waiver affecting an executory portion of a contract may retract the waiver by notifying the other party that strict performance of any term waived will be required, unless such a retraction would be unjust because of a material change of position made in reliance on the waiver."); RESTATEMENT (SECOND) OF CON-

TRACTS § 84 cmt. f ("[W]here the requirement of a condition is waived in advance, the promisor may reinstate the requirement by giving notice to the other party before the latter has materially changed his position.").

31. *Bailey,* 1987 WL 37178, at *2; *Roam–Tel Partners,* 2010 WL 5276991, at *9 (citations omitted); 13 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 39:20 (4th ed.); RESTATEMENT (SECOND) OF CONTRACTS § 84 cmt. f. *See also* 14 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 46:14 (4th ed.) ("[T]he waiving party can retract the waiver ... by again specifying a reasonable time within which the performance must be rendered."). In other contexts, this Court has held that "[o]nce a right is waived, it is gone forever." *See Harleysville Ins. Co. v. Church Ins. Co.,* 892 A.2d 356, 364 (Del.2005) (citing *Hanson v. Fidelity Mut. Ben. Corp.,* 13 A.2d 456, 460 (Del.Super.1940)).

prejudice of losing his NYBOT trading rights. Because the Defendants waived the Initial Deadline and the retraction of that waiver was invalid as a matter of law, the Election Form that Amirsaleh submitted on January 19, 2007, at 2:06 p.m., was properly filed and timely received. The Defendants must honor that Election Form.

### Conclusion

The judgment of the Court of Chancery is **REVERSED** and this matter is **REMANDED** for further proceedings consistent with this Opinion.