# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LENNOX INDUSTRIES, INC. and ALLIED AIR ENTERPRISES LLC. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. N19C-03-045 AML CCLD |
| ALLIANCE COMPRESSORS LLC, | ) ) | |
| Defendant. | ) ) | |

**Submitted: July 1, 2021**
**Decided: October 25, 2021**

## MEMORANDUM OPINION

### Upon Defendant's Motion for Summary Judgment - GRANTED

Richard P. Rollo, Travis S. Hunter, and Alexandra M. Ewing of RICHARDS, LAYTON, & FINGER, P.A., Wilmington, Delaware; Eric B. Halper and N. Cyrus Bayar of MCKOOL SMITH P.C., New York, New York, Attorneys for Plaintiffs Lennox Industries, Inc. and Allied Air Enterprises LLC.

Jon E. Abramczyk, D. McKinley Measley, and Alexandra M. Cumings, of MORRIS, NICHOLS, ARSHT, & TUNNELL LLP, Wilmington, Delaware; James F. Bennett, John D. Comerford, of DOWD BENNETT LLP, St. Louis, Missouri, Attorneys for Defendant Alliance Compressors, LLC.

**LEGROW, J.**

The plaintiff in this case manufactures air conditioning units and, in a joint venture with another manufacturer, created the defendant company to manufacture the compressors needed for the plaintiff's units.  In 1996, the parties entered into a fifty-year supply agreement whereby the plaintiff committed to purchase annually a contractually specified percentage of the plaintiff's total compressor needs.  Although the defendant only manufactures one type of compressor, the supply agreement bases the plaintiff's minimum purchase percentage on the plaintiff's total usage of compressors, regardless of their form.  For twenty years, the plaintiff easily met its minimum purchase obligation, but the plaintiff's purchases declined in the past decade.  In 2017, the plaintiff told the defendant that, under the plaintiff's understanding of the supply agreement, only compressor types the defendant manufactured were included in the total usage calculation.  The defendant disagreed, asserting that the supply agreement required the plaintiff to account for its total usage of all compressor types.

After engaging in a dispute resolution process mandated by their contract, the parties were unable to resolve their disagreement, and the plaintiff filed this action seeking declaratory judgment that its interpretation of the supply agreement is correct.  At the close of discovery, the defendant moved for summary judgment, arguing the supply agreement's plain and unambiguous language contradicts the plaintiff's purported interpretation.  Because (i) the plain terms of the supply

agreement include in the total usage calculation all compressor types the plaintiff's business uses, (ii) no latent ambiguity exists as to the supply agreement's terms, and (iii) the plaintiff failed to offer sufficient evidence to show by clear and convincing evidence that the parties waived or modified the agreement's terms, the defendant's motion for summary judgment is granted.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed. Plaintiff Lennox Industries Inc. ("Lennox") manufactures air conditioning units. In 1993, Lennox and another air conditioning manufacturer, American Standard Inc. (now "Trane"),[1] formed Defendant Alliance Compressors LLC ("Alliance") to ensure Lennox and Trane a reliable supply of compressors, which are essential components in air conditioning units.[2] In 1996, subsidiaries of Emerson Electric Co. ("Emerson"), a compressor manufacturer, joined Alliance and assumed control of developing Alliance's manufacturing operations. In connection therewith, Emerson invested substantial capital to build Alliance's manufacturing facility in Natchitoches, Louisiana.[3] Emerson now holds a 51% interest in Alliance, while Lennox and Trane each hold a 24.5% interest.[4]

---

[1] American Standard, Inc. became Trane in 2007 and was acquired by Ingersoll Rand. As did the parties in their briefing, the Court refers to this entity as "Trane" throughout the opinion regardless of time period.

[2] Def.'s Mot. at 3.

[3] *Id.* at 4.

[4] Pl.'s Resp. at 5-6.

At the time Alliance was formed, reciprocating compressors were the dominant compressor used by air conditioning manufacturers.[5] Over time, additional types of compressors have been introduced into the market, such as fixed scroll, two-stage, variable speed, and rotary compressors.[6] Lennox uses a variety of different compressors in its units. Alliance, however, only manufactures scroll compressors.

In 1996, Lennox and Alliance entered into a supply agreement (the "Supply Agreement") whereby Lennox agreed to "purchase from [Alliance], a number of Products equal to the applicable Target Level."[7] The Supply Agreement defined Target Level as "in any year, a number of Products equal to the product of (i) the Total Usage for such year multiplied by (ii) the Purchase Commitment Percentage for such year."[8] An exhibit to the Supply Agreement specifies the Purchase Commitment Percentage for each year of the contract. Total Usage is defined as "the total number of compressors *(whether in scroll, reciprocating or other form)* in the 1½ to 7 ton range that are used in such year by [Lennox] to satisfy the production needs of the Business . . ."[9] "Business" means Lennox's heat pump and air conditioning business conducted in North and Central America.[10] In other words,

---

[5] *Id.* at 4.
[6] *Id.*
[7] Def.'s Mot. at 5-6.
[8] *Id.*, Ex. 1, at 4.
[9] *Id.*, Ex. 1, at 5 (emphasis added).
[10] *Id.* at 2.

expressed as a mathematical formula, Target Level = Total Usage x Purchase Commitment Percentage. The parties' present dispute is over the meaning of Total Usage.

The Supply Agreement's initial term is for fifty years and lasts through 2046.[11] Section 4(b) of the Supply Agreement states, "[Lennox's] obligations to purchase Products in accordance with this Agreement are subject to [Alliance] providing Products that are competitive on an overall basis taking into account price, performance, quality, and delivery with other compressors available to [Lennox] at the relevant time."[12] Section 2(a) of the Supply Agreement requires Lennox to use all commercially reasonable efforts to satisfy its minimum purchase obligation.[13] Lennox also is required to provide Alliance with a written statement ("Volume Statement") at the end of each year, setting forth its purchases and Total Usage for the year.[14]

In 2013, Lennox approached Alliance's general manager, Brent Schroeder, about its need for variable speed compressors, and Alliance began creating a line of variable speed compressors. Karl Zellmer, Alliance's Vice President of Sales, testified at his deposition that, in 2014, Alliance offered to "look the other way" with

---

[11] *Id.*, Ex. 2, II § 2.4.
[12] *Id.*, Ex. 1, § 4(b).
[13] *Id.*, Ex. 1, § 2(a).
[14] *Id.*, Ex. 9.

respect to Lennox's variable speed compressor purchases until Alliance launched its new line the next year.[15] Around mid-2014, Alliance and Lennox discussed entering into a separate sales agreement allowing Lennox to purchase variable speed compressors from Emerson.[16] During the negotiations, Lennox employee Ronnie Yarber emailed Chris Mays, an employee of both Alliance and Emerson, asking if Lennox's purchases of variable speed scroll compressors from Emerson would count as part of Total Usage for purposes of the Alliance Supply Agreement.[17] Mays indicated variable speed compressors would not count towards Total Usage, but also stated variable speed compressors could be considered if Alliance manufactured them in the future.[18] Ultimately, however, the proposed sales agreement between Lennox and Emerson never was executed.

Under the Supply Agreement, Lennox currently is required to purchase 56% of its compressor needs from Alliance.[19] During the first ten to fifteen years of the Supply Agreement's term, Lennox met and often exceeded its minimum purchase obligation.[20] Starting in 2010, however, Lennox began purchasing more compressors from other suppliers and less from Alliance.[21] In January 2016,

---

[15] Zellmer Dep. at 132:18-133:5.
[16] Def.'s Mot., Ex. 17 at 1-2.
[17] Id., Ex. 17 at 1.
[18] Id.
[19] Id., Ex. 2.
[20] Id. at 7.
[21] Id.

5

Alliance requested a Volume Statement from Alliance for fiscal year 2015, which indicated Lennox purchased 66% of its compressors from Alliance.[22] Later in 2016, at Alliance's request, Lennox provided a Volume Statement for fiscal year 2016 that reported Lennox purchased 56.4% of its compressor needs from Alliance.[23] In October 2017, however, Lennox informed Alliance that, in its view, only compressor types that Alliance manufactures are included in Total Usage and, accordingly, Lennox excluded variable speed compressors when calculating its Total Usage in the 2015 and 2016 Volume Statement calculations.[24] Paul Liddell, then Director of Alliance Sales, explained in an email to Mr. Yarber that all compressors types were to be included in Total Usage, not merely the type Alliance manufactures.[25] Mr. Liddell stated it was unclear why Mr. Mays had stated otherwise but that, in the future, variable speed compressors must be included in the Volume Statement.[26]

The parties were unable to resolve their dispute as to the definition of Total Usage. The parties first engaged in a contractually mandated dispute resolution process, which proved unsuccessful. On March 5, 2019, Lennox commenced this action, seeking declaratory judgment that its interpretation of the Supply Agreement is correct.[27] Two days later, Alliance filed a complaint in the Court of Chancery

---

[22] *Id.*, Ex. 10 at 1. Lennox's Purchase Commitment Percentage in that year was 56%.
[23] *Id.*, Ex. 11 at 1.
[24] *Id.*, Ex. 14 at 1.
[25] *Id.*, Ex. 17 at 1-2.
[26] *Id.*
[27] *Id.* at 10.

6

claiming breach of contract and seeking a declaratory judgment and specific performance.[28] The Court of Chancery dismissed Alliance's action for lack of subject matter jurisdiction,[29] after which Alliance filed in this action counterclaims for declaratory judgment, anticipatory repudiation, and breach of contract. This Court dismissed as unripe Alliance's counterclaims for anticipatory repudiation and breach of contract because the parties had not engaged in the alternative dispute resolution process required by the LLC Agreement.[30] At the conclusion of discovery, Alliance moved for summary judgment as to Count I of Lennox's complaint and Count III of Alliance's counterclaim. After briefing and oral argument, the Court took the motion under advisement.

## PARTIES' CONTENTIONS

Alliance argues summary judgment should be granted in its favor because the Supply Agreement's unambiguous language requires Lennox to include all forms of compressors in its Total Usage calculation.[31] Alliance asserts Lennox's interpretation of the Supply Agreement would lead, illogically, to the point that Lennox is not required to purchase any compressors from Alliance.[32] Alliance

---

[28] *Id.*

[29] *Alliance Compressors LLC v. Lennox Industries, Inc.*, C.A. No. 2019-0186-KSJM (Jan. 6, 2020).

[30] *Lennox Indus. Inc. and Allied Air Enterprises LLC v. Alliance Compressors LLC*, C.A. No. N19C-03-045 AML CCLD (Aug. 10, 2020).

[31] Def.'s Mot. at 11.

[32] *Id.* at 15, 17.

7

further argues that, although the Court need not consider extrinsic evidence because the contract is not ambiguous, the extrinsic evidence in the record is consistent with Alliance's interpretation of the Supply Agreement.[33] Alliance contends Mr. Mays' email to Lennox did not modify the Supply Agreement because (i) the email was made in the context of the parties' failed negotiation of a separate sales agreement and (ii) Mr. Mays testified he was offering a temporary business accommodation.[34] Alliance further asserts internal documents and the parties' course of performance demonstrate Alliance always has included all forms of compressors when calculating Total Usage.[35] Finally, Alliance maintains its interpretation is supported by the fact that Trane consistently has included all compressor types in Total Usage when meeting its own minimum purchase requirement.[36]

Lennox contends the Supply Agreement facially is ambiguous when the definition of Total Usage is read within the Supply Agreement's entire context, as Delaware law requires.[37] According to Lennox, the parenthetical "whether in scroll, reciprocating or other form" qualifies the compressors included in Total Usage and clarifies that Total Usage only includes compressor types manufactured by Alliance in whatever form they may be.[38] For support, Lennox cites the fact that the

---

[33] *Id.* at 19.
[34] *Id.* at 19-20.
[35] *Id.* at 22-23.
[36] *Id.* at 23.
[37] Pl.'s Resp. at 15-16.
[38] *Id.* at 16-17.

8

compressor types mentioned in the parenthetical match those Alliance manufactured or contemplated manufacturing at the time the Supply Agreement was executed.[39] In the alternative, Lennox argues a latent ambiguity exists in the Supply Agreement arising from the fact that the parties did not address how to count compressor types not manufactured by Alliance until nearly twenty years into the Supply Agreement's initial term.[40] Further, Lennox contends Alliance's interpretation commercially is unreasonable because it would require Lennox to purchase compressors it cannot use.[41] Lennox asserts this result makes little sense, especially in light of the agreement's fifty-year term.[42] Finally, Lennox argues extrinsic evidence supports its interpretation.[43] Lennox maintains Mays's 2014 email reflected Alliance's interpretation of the Supply Agreement.[44] Lennox implies Alliance either waived its interpretation or acquiesced in Lennox's interpretation by operating for several years without counting toward Total Usage compressor types not manufactured by Alliance.[45] As to Alliance's dealings with Trane, Lennox contends that evidence is irrelevant because Trane was not a party to the Supply Agreement.[46]

---

[39] *Id.* at 18.
[40] *Id.* at 22.
[41] *Id.* at 28.
[42] *Id.* at 29.
[43] *Id.*
[44] *Id.* at 32.
[45] *Id.* at 33.
[46] *Id.* at 36. The Supply Agreement at issue in this case is a bilateral contract between Lennox and Alliance. Trane and Alliance have a similar, but separate, agreement.

9

# STANDARD OF REVIEW

Summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[47] A material issue of fact exists if "a rational finder of fact could find some material fact would favor the moving party in a determinative way[.]"[48] The record must be viewed in the light most favorable to the non-moving party.[49] The moving party bears the initial burden to demonstrate there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.[50] If the moving party meets the initial burden, the burden shifts to the non-moving party to show that a genuine issue of material fact is in dispute.[51] "It is not enough for the opposing party merely to assert the existence of such a disputed issue of fact[,]" and "[i]f the facts permit reasonable persons to draw from them but one inference, the question is ripe for summary judgment."[52]

---

[47] Super. Ct. Civ. R. 56(c).
[48] *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *3 (Del. Ch. Dec. 29, 2009).
[49] *Gruwell v. Allstate Ins. Co.*, 988 A.2d 945, 947 (Del. Super. 2009).
[50] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).
[51] *Id.* (citing *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979)).
[52] *Id.* (citing *Wootten v. Kiger*, 226 A.2d 238, 239 (Del. 1967)).

# ANALYSIS

### A. The Supply Agreement's plain terms define Total Usage to include all types of compressors Lennox purchases, not just scroll compressors.

The Supply Agreement unambiguously defines Total Usage to include all compressor types, not merely the type Alliance manufactures. "When interpreting a contract, the role of a court is to effectuate the parties' intent."[53] In doing so, clear and unambiguous language should be given its ordinary and usual meaning where no special meaning is intended.[54] A contract is not ambiguous simply because the parties disagree as to the meaning of contractual language; rather, ambiguity exists when the terms in question reasonably are susceptible of two different meanings or interpretations.[55]

The Supply Agreement's terms expressly require Lennox to purchase 56% of its total compressor needs from Alliance. The Supply Agreement defines "Total Usage" as "in any year, the total number of compressors (whether in scroll, reciprocating, or other form) in the 1½ through 7 ton range."[56] The inclusion of the parenthetical removes any doubt that the parties intended to include more than just the compressor types Alliance manufactured. Specifically, the definition refers to reciprocating compressors, even though it is undisputed that at the time the parties

---

[53] *Lorillard Tobacco Co. v. American Legacy Foundation*, 903 A.2d 728, 739 (Del. 2006) (citing *Northwestern National Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996)).

[54] *Id.*; *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 59 (Del. Super. 1995).

[55] *Rhone-Poulenc v. American Motorists Ins.*, 616 A.2d 1192, 1196 (1992).

[56] Def.'s Mot., Ex. 1, § 1.

entered into the Supply Agreement, and at all times since then, the only type of compressors Alliance manufactured were scroll compressors.

This undisputed fact entirely undercuts Lennox's assertion that the parenthetical merely clarifies the types of compressors Alliance manufactures. Lennox argues, confusingly, that the definition of Total Usage is ambiguous because "the parenthetical qualifies 'total number of compressors.'" Lennox goes on, reasoning that by qualifying "total number of compressors," the parenthetical indicates Total Usage must mean something less than all types of compressors. Lennox therefore concludes "the parenthetical clarifies that 'Total Usage' includes compressor types manufactured by Alliance, whatever those may be."[57] But Lennox's reasoning elides the undisputed fact that the Alliance only ever manufactured scroll compressors, meaning that the parenthetical's reference to "reciprocating or other form" cannot, based on the four corners of the agreement, mean that Total Usage only refers to the compressors Alliance manufactures.[58]

Rather than giving meaning to the parenthetical, Lennox's interpretation would require the Court to disregard it altogether. Delaware courts avoid reading contracts in a way that would render provisions illusory or meaningless or that would

---

[57] Pl.'s Resp. at 17.

[58] The agreement expressly defines "Products" as scroll compressors within a particular size range. Def.'s Mot., Ex. 1 at 3. As explained below, Lennox relies extensively on extrinsic evidence to argue that the parenthetical was intended to refer to the types of compressors the parties at one point anticipated Alliance would manufacture. The Court, however, cannot consider extrinsic evidence unless it first concludes the contract is ambiguous.

read language out of the agreement.[59] In order to construe "the total number of compressors [within the size range]" as referring only to the compressors Alliance makes, the Court would have to ignore the parenthetical, which plainly includes compressor types Alliance did not and does not manufacture. Lennox contends Alliance's interpretation would render the parenthetical superfluous because the phrase "the total number of compressors" already means all compressors without exclusion. But as discussed above, the parenthetical functions to remove doubt as to whether all compressor types are included in the definition. The fact that the parenthetical clarifies the "total number of compressors" language does not make it superfluous or redundant.

Even if the parenthetical could be viewed as redundant of the reference to "the total number of compressors," that redundancy is preferable to ignoring the parenthetical altogether. A construction that produces "some redundancy is acceptable" if the construction gives effect to the contract language and discharges the parties' intent.[60] Notwithstanding surplusage concerns, redundant interpretations "are preferable" if construing undefined terms otherwise would contravene the parties' intent.[61] Here, the parties included the parenthetical to remove any doubt

[59] *O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 287 (Del. 2001); *Seabreak Homeowners Ass'n v. Gresser*, 517 A.2d 263, 269 (Del. Ch. 1986).
[60] *In re IAC/InterActive Corp.*, 948 A.2d 471, 499 (Del. Ch. 2008) (internal quotation marks omitted).
[61] *Id.* at 498, n.109; *See U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *15 (Del. Ch. June 6, 1996) ("While redundancy is sought to be avoided in interpreting contracts, this principle

that "total number of compressors" referred to more than just the type of compressors Alliance manufactured. In other words, the parties accepted some redundancy to guarantee their contractual expectations would be fulfilled.[62]

In addition to requiring the Court to ignore the parenthetical, Lennox's argument that the contract facially is ambiguous depends on Lennox's interpretation of extrinsic evidence, including partnership agreements and drafts of the Supply Agreement that predated the operative agreement. Specifically, Lennox notes the compressor types mentioned in the parenthetical closely match the products Alliance contemplated manufacturing in earlier drafts or versions of partnership agreements.[63] But it is axiomatic that the Court cannot consider extrinsic evidence in order to "find" an ambiguity that is not apparent on the face of the contract.[64] The fact that earlier agreements may match the compressor types listed in the parenthetical cannot override the clear language limiting Alliance's manufacturing to scroll compressors while stating that Total Usage would include all Lennox's compressor needs, evidencing an intent that all compressors be considered.

of construction does not go so far as to counsel the creation of contract meaning for which there is little or no support in order to avoid redundancy.").

[62] *See iBio, Inc. v. Fraunhofer USA, Inc.*, 2016 WL 4059257, at *11 (Del. Ch. July 29, 2016) (finding a "somewhat redundant" provision not meaningless "to the extent" it gave the parties "additional comfort").

[63] Pl.'s Resp. at 18.

[64] *Renco Group, Inc. v. MacAndrews AMG Holdings LLC*, 2013 WL 3369318, at *5 (Del. Ch. June 19, 2013) (citing *Conner v. Phoenix Steel Corp.*, 249 A.2d 866, 868 (Del. 1969)).

Alliance's interpretation is the only reasonable reading of the relevant contractual language. The Supply Agreement plainly states that Lennox's Target Level is the annual percentage of Lennox's total compressor usage during the year. Alliance's interpretation also is consistent with the definition's reference to "the production needs of the Business," which expressly is defined to include Lennox's heat pump and air conditioning business in North and Central America. This language clarifies the parties' intent to consider Lennox's complete business needs, not just its business needs for scroll compressors.

Lennox seeks to blunt or blur this interpretation of the agreement's plain language by emphasizing that the parties' relationship revolves around "Products," which Lennox asserts are defined as compressor types manufactured by Alliance.[65] Lennox refers to several provisions in the Supply Agreement that discuss how Products may be discontinued and will be affected by market demand. According to Lennox, its interpretation of Total Usage is consistent with these provisions because it would allow Lennox's purchase obligation to adjust to changes in product availability.[66] Again, however, this fails to account for the specific language

---

[65] This actually misreads the defined term "Products," which is limited to "(i) 1 ½ through 7 ton Scroll Compressors . . . and (ii) to the extent [Alliance] becomes capable of producing them on a commercial basis, 1 through 6 ton Co-rotating Scroll Compressors . . . ." Def.'s Mot., Ex. 1 at 3. In Exhibit 1 to the Supply Agreement, the parties listed the model numbers for the Products Alliance expected to produce, and the parties acknowledged "it is likely that Exhibit 1 will be amended from time to time as a result of technological, competitive and other developments." *Id.* at 3-4. The parties agreed to negotiate such amendments in good faith.
[66] Pl.'s Resp. at 21.

defining Total Usage as the total number of compressors Lennox uses, regardless of type.

Moreover, Alliance's interpretation does not, as Lennox asserts, require Lennox to purchase from Alliance compressors for which it has no use, nor does it impose "draconian" restrictions. Under Section 4(b), Lennox's minimum purchase obligation is contingent on Alliance providing competitive Products, considering, among other things, other compressors available to Lennox at the time.[67] The parties created this provision as a contractual solution to address the possibility that, over the agreement's fifty-year term, market changes could affect the competitiveness of Alliance's products. Lennox cannot assert the Supply Agreement's unambiguous terms are unreasonable over a fifty-year term when the parties clearly contemplated the inevitable market shifts that have occurred over time and negotiated a provision to address such issues. That Lennox now finds this provision insufficient or undesirable is not a basis to rewrite other, unambiguous contractual terms to achieve the result Lennox desires.

To summarize, Lennox does not have to purchase anything from Alliance other than the compressors Alliance manufactures; but its minimum purchase requirement is based on all types of compressors used in Lennox's business. The fact that the contract became less financially or competitively advantageous over

---

[67] Def.'s Mot., Ex. 1, § 4(b).

time is not basis to find ambiguity or rewrite the contract. The parties were sophisticated businesses with ready access to counsel when they negotiated the agreement. It is not the Court's function to rewrite contracts that one party regrets in hindsight.[68]

## B. There is no latent ambiguity in the definition of Total Usage.

Lennox does not offer any evidence or disputed facts from which a trier of fact reasonably could conclude the Supply Agreement suffers from latent ambiguity. Latent ambiguity exists where "the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings . . . ."[69] Latent ambiguity rarely is found. The classic case exemplifying a latent ambiguity involved two parties who contracted for shipment of cotton aboard a ship named "Peerless," not knowing two different ships existed with that name.[70] A latent ambiguity cannot overcome unambiguous contractual language, and the party

---

[68] *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1033 (Del. Ch. 2006) ("[C]ourts will not rewrite contractual language covering particular topics just because one party failed to extract as complete a range of protections as it, after the fact, claims to have desired during the negotiation process."); *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998) ("Delaware observes the well-established general principle that (absent grounds for reformation which are not present here) it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement.").

[69] *Ambiguity*, BLACK'S LAW DICTIONARY (rev. 4th ed. 1977); *See also North American Philips Corp. v. Aetna Cas. And Sur. Co.*, 1995 WL 628441 (Del. Super. Ct. Mar. 10, 1995).

[70] *Raffles v. Wichelhaus*, 159 Eng. Rep. 375 (1864); *See also Greene v. Hanover Ins. Co.*, 700 So.2d 1354, 1356 (Ala. 1997) (allowing parol evidence to show that the naming of "James Scott Vance" in an insurance policy was a transposition of the person's first and middle names and was intended to refer to "Scott James Vance.").

17

seeking to show a latent ambiguity must establish that the words in question, although apparently clear on their face, have two or more equally possible meanings due to some external fact not known at the time of contracting.[71]

Lennox has not pointed to disputed facts that would allow a conclusion that there are two or more equally possible meanings for "Total Usage." Lennox urges the ambiguity only became apparent when other types of compressors began to be used widely. But this argument neither suggests that any words used in the contract have more than one meaning nor permits an inference that the parties were not aware of the likelihood that compressor technology would change over the course of a fifty-year contract. To the contrary, Lennox concedes the parties anticipated changing technology. The definition of "Products" acknowledges that the parties likely would amend the definition at some time due to technological, competitive, or other developments.[72] The fact that a dispute did not arise until twenty years into the Supply Agreement's initial term is not evidence of latent ambiguity.

Lennox appears to assert that a latent ambiguity must exist because the parties now disagree over the Supply Agreement's meaning. Contractual terms are not rendered ambiguous merely because parties to litigation now disagree on their meaning, and the Court is not free to search for ambiguity where none exists.[73]

---

[71] 11 WILLISTON ON CONTRACTS § 33:43 (4th ed. 2003).
[72] Def.'s Mot., Ex. 1, § 1.
[73] *Comet Systems, Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1030 (Del. Ch. 2008).

Lennox has provided no facts demonstrating a latent ambiguity in the Total Usage definition, and the Court need not look beyond its plain, unambiguous meaning.

## C. There are no material facts in dispute that would allow a reasonable jury to find in Lennox's favor as to waiver, acquiescence, modification, or amendment.

### i. Waiver & Acquiescence

As an affirmative defense to Alliance's declaratory judgment claim, Lennox argues Alliance (i) waived any claim that Lennox was required to calculate its Total Usage based on all types of compressors it uses for its business, or (ii) acquiesced in Lennox's interpretation. Lennox, however, fails to offer evidence that a jury could conclude clearly and convincingly demonstrates waiver or acquiescence.[74] Delaware courts will find waiver upon a showing that: (i) there is a requirement or condition capable of being waived, (ii) the waiving party knows of that requirement or condition, and (3) the waiving party intends to waive that requirement or condition.[75] Waiver requires "knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights."[76] Because waiver is "redolent of forfeiture," the standard for waiver is "quite

---

[74] Lennox did not plead waiver or acquiescence as an affirmative defense, as is required for it not to be waived. Nonetheless, Lennox's defense fails on its merits.

[75] *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at *34 (Del.Ch. Mar. 30, 2017) (citing *Amirsaleh v. Bd. of Trade City of N.Y.*, 27 A.3d 522, 530 (Del. 2011)).

[76] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) (citation omitted).

exacting" and the facts demonstrating waiver must be "unequivocal."[77] Delaware courts require intent to waive a contractual provision be evidenced by clear and convincing evidence.[78] Similarly, "[a]cquiescence arises where a complainant has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved."[79] Like waiver, the party must (i) have full knowledge of his rights and all material facts; (ii) possess a meaningful choice in determining how to act, and (iii) act voluntarily in a manner showing unequivocal approval of the challenged conduct.[80]

Lennox's waiver and acquiescence arguments fail for two reasons. First, the Supply Agreement contains a valid and enforceable non-waiver clause. Section 12(c) provides "[t]he failure or delay by any party in asserting any right hereunder

---

[77] *Simon-Mills II, LLC*, 2017 WL 1191061, at *34 (citing *Amirsaleh v. Bd. of Trade City of N.Y.*, 27 A.3d 522, 529 (Del. 2011)); *See also Kallop v. McAllister*, 678 A.2d 526, 532 (Del. 1996) ("Waiver, however, requires more than mere inaction. To substantiate his waiver defense, [the defendant] needed to show that [the plaintiff] intentionally relinquished his right to rely on the Letter Agreement.").

[78] *Specialty Dx Holdings, LLC v. Laboratory Corporation of America Holdings*, 2020 WL 5088077, at *9 (Del. Super. Jan. 31, 2020) (citing *Ballenger v. Applied Digital Solutions, Inc.*, 2002 WL 749162, at *8 (Del. Ch. Apr. 24, 2002)); *See also Eureka VII LLC v. Niagara Falls Holdings LLC*, 899 A.2d 95, 109-10 (Del. Ch. 2006) (citing *AeroGlobal Capital Mgmt.*, 871 A.2d at 444).

[79] *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *17 (Del. Ch. Oct.10, 2006).

[80] *In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at *9 (Del. Ch. Mar. 23, 2012).

20

shall not preclude such party from subsequently asserting such right."[81] "Non-waiver clauses serve an important purpose in contract law by ensuring that a party to a contract is given an opportunity to make a thoughtful and informed decision about whether or not to enforce a particular contract right."[82] Such clauses provide a contracting party assurance that its failure to require the other party's strict adherence to a contract term will not result in a complete and unintended loss of its contractual rights.[83] The Supply Agreement's non-waiver clause broadly and unambiguously preserves either party's contractual rights despite a failure or delay in asserting these rights. Alliance's actions therefore did not waive its right to enforce the Supply Agreement's plain language including all compressor types in the definition of Trade Usage.

Second, Lennox hypothesizes that Alliance should have known Lennox was excluding all non-scroll compressors from its calculation because Alliance is able to track Lennox's purchase volumes and could have audited Lennox's Volume Statements.[84] But Alliance offers evidence that, when it tracked Lennox's purchase volumes, it did so with a methodology that including all compressor forms.[85] Given Lennox's heightened evidentiary burden and the conflicting evidence on this point,

---

[81] Def.'s Mot., Ex. 1, § 12(c).
[82] *Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at *27 (Del. Ch. Apr. 2, 2007).
[83] *Rehoboth Mall Ltd. P'ship v. NPC Int'l, Inc.*, 953 A.2d 702, 704 (Del. 2008) (citing *Viking Pump, Inc.*, 2007 WL 1207107, at *26).
[84] Pl.'s Resp. at 33.
[85] Def.'s Mot. at 22.

Lennox's conjecture that Alliance could have discovered the exclusion is insufficient to show Alliance intentionally waived its contractual rights or acquiesced in Lennox's interpretation of the Supply Agreement.

### ii. Modification

Lastly, Lennox asserts the parties modified the Supply Agreement through their course of performance.[86] At the outset, it is notable that the Supply Agreement expressly prohibits oral modifications or amendments. Section 12(e) of the Supply Agreement provides that "[t]his Agreement may be hereafter amended only by a written document duly executed by each party hereto."[87] Even with such a contractual clause, however, the parties' course of performance may modify any term inconsistent with the course of performance.[88] Course of performance is a sequence of conduct where: (i) the parties' agreement involves repeated occasions for performance by one party, and (ii) the other party knowingly accepts the performance or acquiesces in it without objection.[89] A party claiming modification faces a high evidentiary burden and must prove the terms of the modification are definite, certain, and intentional; indefinite expressions and mere negotiations for a

---

[86] Lennox did not plead modification as an affirmative defense, as is required to preserve the defense. Nonetheless, Lennox's modification defense fails on its merits.

[87] Def.'s Mot., Ex. 1, § 12(e).

[88] 6 Del. C. § 1-303(f); *See also Lowe v. Bennett*, 1994 WL 750378, at *3 (Del. Super. Dec. 29, 1994).

[89] 6 Del. C. § 1-303(a).

22

variance cannot constitute a modification.[90] Accordingly, although parties can modify a contract through the course of performance, the conduct relied upon must be unequivocal in character.[91]

The evidence Lennox offers is insufficient to meet that standard. Once a contract is finalized, it cannot be modified without consideration and both parties' consent.[92] Lennox has not offered any evidence that the parties exchanged consideration for the purported modification. Drawing inferences in Lennox's favor, there is evidence that, while in the course of negotiating a new contract regarding the sale of other compressors, the parties discussed modifying the minimum purchase obligation. It is undisputed, however, that the parties' negotiations never came to fruition, and those negotiations therefore cannot constitute consideration or unequivocal conduct evincing modification.

Further, the facts Lennox offers to show an intent to modify would not allow a reasonable jury to find in Lennox's favor. Mr. Mays's email confirming that variable speed compressors would not count toward the minimum purchase obligation was made in the context of negotiations regarding a separate sales agreement unrelated to the Supply Agreement.[93] Mr. Zellmer testified that

---

[90] 17A C.J.S. *Contracts* § 565.
[91] *Id.* at § 564.
[92] *De Cecchis v. Evers*, 54 Del. 99, 101 (Del. 1961).
[93] *See* Def.'s Mot., Ex. 7 at 1-3.

23

Alliance's offer to "look the other way" regarding variable speed compressors was a temporary business accommodation lasting only until Alliance could bring its line of variable speed compressors to the market.[94] At best, Lennox's evidence indicates the parties negotiated for a temporary variance during discussions regarding a separate supply agreement. None of this evidence demonstrates definite, certain, and intentional modification sufficient to satisfy Lennox's heightened evidentiary burden. Accordingly, summary judgment is appropriate.

## CONCLUSION

For the reasons set forth above, the Court grants summary judgment in favor of Alliance as to Count I of Lennox's complaint and Count III of Alliance's counterclaim.

---

[94] Zellmer Dep. at 170:19-171:1-2.