**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

February 5, 2024

Paul G. Enterline, Esquire
113 S. Race St., P.O. Box 826
Georgetown, DE 19947

Brian J. Ferry, Esquire
P.O. Box 1351
Wilmington, DE 19899

RE: ***Ronald Grant Morris v. Delmarva Real Estate Holdings, LLC***,
Civil Action No. 2022-1211-MTZ

Dear Counsel:

Both parties disputing the terms of a purchase option have moved for summary judgment. For the reasons detailed below, I grant the motion filed by defendant Delmarva Real Estate Holdings, LLC ("Delmarva") and deny the one filed by plaintiff Ronald Grant Morris.

## I.    BACKGROUND[1]

### A.    The Contract

On September 1, 2017, Morris and Delmarva executed an agreement titled "Commercial Triple Net Lease With Purchase Option" (the "LPO" or "Contract")

---

[1] I draw the following facts from Morris's complaint and the documents integral to it, and the additional record submitted in connection with each motion. Citations in the form of "Compl." refer to Morris's Verified Complaint, available at Docket Item ("D.I.") 1; citations in the form of "Def. Mot." refer to Delmarva's Motion for Judgment on the Pleadings, available at D.I. 17; citations in the form of "Pl. Mem." refer to Morris's Memorandum In Response To Defendant's Motion For Judgment On The Pleadings And

for a property at 14702 Baker Road, Delmar, Delaware, 19940 (the "Property").[2]

Consistent with its title, the LPO set Morris's monthly payment and the process by

which Morris could exercise a purchase option.[3]  The lease ran for five years, from

September, 1, 2017 to August 31, 2022,[4] and the purchase option began on

July 1, 2022 and expired on October 31, 2022.[5]  That is, the purchase option

extended beyond the expiration of the lease by two months.[6]  Delmarva could, "in

its sole discretion," extend the lease on a month-by-month basis.[7]

The Contract includes a Purchase Option Amortization Schedule (the

"Schedule") that reflects the parties valued the Property at $350,000 when the LPO

was executed, and Morris's cost to exercise the purchase option at the end of the

lease term would be $292,092.02.[8]  LPO Section 12 explained that for Morris to

---

Cross Motion And Memorandum For Judgment On The Pleadings Or, In The Alternative, Summary Judgment, available at D.I. 20; citations in the form of "Def. Reply" refer to Defendant's Reply Memorandum, available at D.I. 24; and citations in the form of "Pl. Reply" refer to Plaintiff's Reply Memorandum, available at D.I. 28.

[2] Compl. ¶¶ 1, 2; D.I. 1, Ex. A [hereinafter "LPO"].

[3] *See* LPO.

[4] *Id.* § 2.

[5] *Id.* § 12.

[6] *Id.*

[7] Def. Mot. ¶ 3; *see* LPO § 2.

[8] LPO § 12.

exercise the purchase option, he needed to notify Delmarva in writing and submit a $10,000 certified check by October 31, 2022.[9] That same section explicitly explained the treatment of Morris's monthly payments if he did not exercise the option as specified:

> If Lessee fails to exercise this Purchase Option in strict accord with the terms and conditions herein or *within the time provided* herein, Lessee agrees and acknowledges that the full consideration paid to Lessor shall be retained by Lessor *as consideration for this purchase option* and neither party shall have any further rights or claims against the other by reason of this Purchase Option.[10]

### B. Morris And Delmarva Discuss Exercising, Then Extending, The Purchase Option.

On July 19, 2022, Morris contacted Delmarva's representative Jim Gregory via text message to ask whether the $10,000 purchase option payment would count toward the purchase price, closing costs, or something else.[11] Gregory clarified it counted toward the purchase price, and added that if Morris chose to pay that

---

[9] *Id.*

[10] *Id.* (emphasis added).

[11] D.I. 20, Ex. 2 at A40.

amount, he could "deposit it just like monthly rent," and there was "[n]o need for certified check and mail"[12] as Section 12 specified.

The parties messaged about the deposit again two days later. Morris indicated that he was trying to obtain financing to purchase the Property, there were two "things on [his] credit report that [he was] paying to be removed," and the underwriter was "just trying to help [him] save on interest."[13] Gregory responded and said, "Let's wait until next week on the $10k. Not a big deal."[14] Gregory expressed hope that Morris could get final approval early in the week of July 25.[15] On July 26, Gregory followed up with Morris and asked for an update when the bank commitment was finalized; Morris confirmed he would provide it.[16]

On October 20, it was clear Morris would not receive financing before the October 31 deadline.[17] Morris suggested extending the lease for another year or two, but the parties did not reach a decision.[18] On October 26, Gregory texted Morris

---

[12] *Id.* at A42.

[13] *Id.* at A44 (cleaned up).

[14] *Id.*

[15] *Id.* at A45.

[16] *Id.* at A46.

[17] *Id.* at A47–48.

[18] *Id.* at A48.

twice that he would not extend the purchase option past December 31.[19]  Morris replied "Okay, that's fine."[20]

The next day, the conversation continued, with Gregory proposing the parties enter another lease agreement if the bank financing did not materialize in time, Morris proposing Delmarva finance the Property for ten years and permit him to "pay [it] off anytime," and Gregory flatly rejecting that idea and then reconsidering it.  Morris paused the conversation, asking if he could call Gregory later that afternoon, and Gregory responded that Morris could call him the next day "or next week."[21]

Morris was quiet for over two weeks.  On the morning of November 15, Gregory texted Morris that because it seemed Morris would not obtain the financing to exercise the option, he would have to vacate the Property by December 31.[22] Gregory then texted an image of the notice of lease termination document he was

---

[19] *Id.* at A49 ("I will stand by my offer thru end of December but after that I am selling the property."); *id.* ("I will mail you an official notice, but I'm not willing to go past December on this.").

[20] *Id.* (responding to Gregory's text that he was "not willing to go past December on this" with "Okay, that's fine").

[21] *Id.* at A52.

[22] *Id.* at A54 ("It doesn't seem like your banking is working out so I'll need you to vacate by the end of December.").

drafting to send Morris by certified letter "in the next couple of days."[23]   That

evening, Morris responded congenially.[24]

From December 4 through December 6, Gregory emailed with Morris's

counsel.  Gregory explained that "[t]he purchase option expired at the end of the

lease term," but "[b]ecause [Morris] was actively working through the financing,

[Gregory] extended the option through December 31, 2022."[25]  He further explained

that "there [wa]s no change in the option price of $292,092.02" and that it "[wa]s

due in full on or before December 31, 2022."[26]  Morris's counsel thanked Gregory

"for th[e] information."[27]

Morris's counsel also passed along the lender's request that Gregory verify

Morris's monthly payments.[28]  Six months earlier, Gregory had sent a verification

letter from Delmarva, stating that "[Morris's] monthly lease payments have never

---

[23] *Id.*

[24] *Id.* at A55 ("I forwarded the information, thank you!  I hope you and Mrs. Pam are well also bud.").

[25] D.I. 20, Ex. 1 at A20.

[26] *Id*.

[27] *Id.* at A21.

[28] *Id.*

been late" since August 2017.[29]  But this time, Gregory did not oblige:  instead, he told Morris, "given the numerous late payments, I don't think anything I could reconstruct would present a favorable picture."[30]

After days passed with Gregory not hearing from Morris or his counsel, Gregory texted Morris on December 10.  He repeated the December 31 purchase deadline, added he was "willing to give [Morris] a 60-day month-to-month" lease, and stressed there would be no extension if Morris continued to ignore him.[31]  That same day, Morris explained he was "not ignoring [Gregory], [he] simply need[ed] proof [he] paid [Delmarva] the past 64 months, so [he] ordered 5 [years] of [his] canceled checks."[32]  When Morris called his past payments his "downpayment," Gregory tersely responded that Morris had "NEVER made a down payment," and "the purchase option [would] not be extended beyond [December 31, 2022]."[33]

Days went by again, and Gregory heard nothing.  Gregory followed up with a December 13 letter:  "This is a reminder that your lease and purchase

---

[29] D.I. 20, Ex. 1 at A13.

[30] *Id.* at A25.

[31] D.I. 20, Ex. 2 at A56.

[32] *Id.* at A56; *see* D.I. 20, Ex. 1 at A30 ("My client is now reconstructing 5 years of payment records to satisfy the 'underwriting requirements.'").

[33] D.I. 20, Ex. 2 at A56–56-a.

option . . . conclude[] on December 31, 2022. Accordingly, if you are unable to exercise the purchase option [by that date], you will need to vacate the premises . . . ."[34] Delmarva stated Morris could extend the lease until the end of February 2023, but emphasized that extension "**does not** extend the purchase option."[35]

On December 14, Morris received preapproval for a mortgage to buy the Property.[36] The preapproval letter "d[id] not constitute a contract or guarantee to lend."[37] On December 19, Morris's counsel notified Gregory of the preapproval.[38] This was the closest Morris had come to obtaining financing, and Gregory offered prompt congratulations.[39]

On December 21, Morris's counsel notified Gregory that Morris had engaged a law firm to handle closing, but he needed another extension of the purchase option

---

[34] D.I. 17, Ex C.

[35] *Id.*

[36] D.I. 20, Ex. 1 at A34.

[37] *Id.*

[38] *Id.* at A35 ("Attached is the loan pre-approval letter for Mr. Morris's purchase of the property . . . [he] will proceed accordingly and notify you of the closing attorney.").

[39] *Id.* ("Wow!!!! Good for him!!!!").

deadline.[40]  His counsel asked Gregory to "please confirm if [the extension] is satisfactory."[41]  Gregory responded the same day, refusing to further postpone the deadline and restating the consequences if the option expired.[42]  Morris's financing did not materialize in time,[43] and his counsel commenced this action on December 30, 2022, expecting Delmarva would not extend the purchase option further.[44]

### C.     Morris Tries To Exercise The Option After It Expired.

On January 3, 2024, Delmarva's counsel wrote Morris's counsel confirming "[t]he option expired on December 31, 2022 because [Morris] failed to deliver the written election to purchase with the $10,000 deposit money by that date."[45]  On January 4, Morris's counsel sent a letter confirming Morris was "ready, willing, and able to pay the $10,000 deposit," failing to mention whether Morris was ready to purchase the Property, and asking how the $10,000 payment would affect the final purchase price.[46]  On January 6, Morris wrote a personal check to Delmarva for

---

[40] *Id.* at A37.

[41] *Id.*

[42] *Id.* at A38.

[43] Compl. ¶ 7.

[44] D.I. 17, Ex. C; Compl. ¶¶ 10, 12.

[45] D.I. 17, Ex. D.

[46] *Compare* D.I. 20, Ex. 2 at A60 *with id.* at A40–42 (indicating a July 2022 text exchange between Morris and Gregory, with Morris asking Gregory the $10,000 downpayment

$10,000.00, then "forged [Gregory's] signature on the back of the check, traveled to Delmarva's bank, and personally deposited the check into Delmarva's account without Delmarva's knowledge or authorization."[47]

### D.     Procedural History

In this action, Morris seeks "an order of specific performance against Delmarva directing it to convey clear and marketable title" of the Property.[48] Delmarva filed its answer on April 4, 2023, and its Motion for Judgment on the Pleadings on June 2.[49]  On July 5, Morris filed a cross-motion for judgment on the pleadings or in the alternative for summary judgment, noting that Delmarva introduced facts beyond the pleadings in its motion.[50]  Delmarva filed an opposition to Morris's motion and reply in support of its own, seeking summary judgment in Delmarva's favor.[51]  Morris filed his reply on August 29.[52]  The Court took the

---

impact on the purchase price, and Gregory attaching the LPO with his response that it would go toward the purchase price).

[47] Def. Mot. ¶ 12; *see* D.I. 17, Ex. E.

[48] Compl. ¶ 23.

[49] D.I. 11; Def. Mot.

[50] *See generally* Pl. Mem.

[51] Def. Reply.

[52] Pl. Reply.

motions under advisement on October 13.[53]    Delmarva's separate action for summary possession, pending in the Justice of the Peace Court, has been stayed pending the resolution of this case.[54]

## II.    ANALYSIS

For the reasons that follow, judgment will be entered in Delmarva's favor. Time is of the essence in the Contract.  This conclusion forecloses Morris's argument that Delmarva breached or repudiated the Contract by refusing to further extend the time to exercise the purchase option.

### A.    Standard of Review

While Delmarva moved for judgment on the pleadings, both parties' submissions included documents outside the pleadings.[55]  Court of Chancery Rule 12(c) provides:

---

[53] D.I. 29.

[54] D.I. 20, Ex. 2 at A62–75.

[55] *See generally* D.I. 17, Exs. A-E; *see also* D.I. 20, Exs. 1–2.

> If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."[56]

Given that both parties requested a summary judgment and neither indicated additional discovery was necessary, rather than ignoring the facts extraneous to the pleadings, I will oblige the parties by considering the facts outside of the complaint and rule on the parties' motions as cross-motions for summary judgment.

This Court will grant a motion for summary judgment where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[57]

---

[56] Ct. Ch. R. 12(c); 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate & Commercial Practice in the Delaware Court of Chancery* § 4.06[c], at 4-28 (2d ed. 2019) ("Consideration of extrinsic documents usually converts Rule 12(c) motion into a motion for summary judgment."); *Jimenez v. Palacios*, 250 A.3d 814, 841 (Del. Ch. Aug. 2, 2019) ("Because the defendants present documents outside of the pleadings in support of their motion, the defendants' motion will be treated as one for summary judgment under Rule 56."), *aff'd*, 237 A.3d 68 (Del. 2020).

[57] Ct. Ch. R. 56(c).

>   Where the parties have filed cross motions for summary judgment and
>   have not presented argument to the Court that there is an issue of fact
>   material to the disposition of either motion, the Court shall deem the
>   motions to be the equivalent of a stipulation for decision on the merits
>   based on the record submitted with the motions.[58]

Morris's Complaint presents two counts:  Count I for "specific performance,"
and Count II for "damages for breach of contract against Delmarva."[59]  Morris's
underlying cause of action on which the parties seek favorable judgments is breach
of contract.[60]  Morris claims Delmarva breached the Contract by not providing a
reasonable extension from the original October 31 deadline for the purchase option,
and by "repudiating" the Contract, committing an anticipatory breach, by insisting
that it would not sell the Property to Morris after the December 31 deadline.[61]

To succeed on a motion for summary judgment, the moving party "must
establish that its construction of the . . . agreement is the *only* reasonable

---

[58] *Garfield v. Boxed, Inc.*, 2022 WL 17959766, at *4 (Del. Ch. Dec. 27, 2022) (internal quotation marks omitted) (citing Ct. Ch. R. 56(h)).

[59] Compl. ¶¶ 22–26, 27–28.

[60] Compl. ¶¶ 1, 28; *see Wollard v. Yoder & Sons Constr., LLC*, 2021 WL 141984, at *1 n.7 (Del. Ch. Jan. 15, 2021) ("Wollard brings six 'counts,' but in addition to two claims sounding in contract and one in tort, the rest are not causes of action, but instead requests for remedies:  specific performance, 'temporary' injunction, and expedition.").

[61] Pl. Mem. 9 ("Delmarva unequivocally rejected any further delay.  This was an anticipatory repudiation of the contract.  Morris was justified in suspending his performance and seeking judicial assistance."); *id.* at 17.

interpretation" as a matter of law.[62] The elements for a breach of contract claim are well-established: (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) damages that the plaintiff suffered as a result of the breach.[63] The first element is undisputed; the second is at the heart of this matter. Morris claims Delmarva breached the LPO by refusing to sell the Property to him, and Delmarva claims any obligation lapsed when Morris failed to timely exercise the purchase option.

The material facts are undisputed: (i) the LPO provided for a five-year lease expiring at the end of August 2022, with a purchase option expiring at the end of October 2022; (ii) Delmarva extended the lease and purchase option until December 31, 2022; (iii) Morris did not tender the $10,000 required to exercise the purchase option before the December 31 deadline; and (iv) Delmarva did not extend the purchase option further.

---

[62] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. Dec. 21, 2007).

[63] *Intermec IP Corp. v. Transcore, LP*, 2021 WL 3620435, at *10 (Del. Super. Aug. 16, 2021).

**B.     The LPO Is An Option Contract; Time Was Of The Essence; And The Option Lapsed.**

Delmarva did not breach the LPO by holding Morris to the December 31 deadline.  The Contract is an option contract, making time of the essence.  Because time was of the essence, Delmarva could rightly insist that the purchase option did not extend past the deadline; doing so was not a breach.

"An option contract has two elements:  the underlying offer concerning the sale or purchase of the property and the collateral promise to hold that offer open."[64] Under Section 12, the LPO contains both elements of an option contract.  First, it contains an offer to sell the Property to Morris "for the purchase price of Two hundred ninety-two Thousand, ninety-two Dollars and two Cents ($292,092.02.

---

[64] *Walsh v. White House Post Prods.*, 2020 WL 1492543, at *5 (Del. Ch. Mar. 25, 2020).

Refer to Exhibit A)."[65]   Second, it contains a collateral promise Delmarva would keep that offer open.[66]   The LPO is an option contract.[67]

Contractual provisions in option contracts are construed strictly, and they often contain express language requiring strict compliance.[68]   "Despite equity's dislike of forfeitures, . . . requirements governing the time and manner of exercise of a power of acceptance under an option contract are applied strictly," and so "[t]he

---

[65] LPO § 12.

[66] *Id.* (indicating Lessor would keep the purchase option open for the Lessee for the duration of the lease through two months after it terminated); *see Alchemy LTD LLC v. Fanchise League Co., LLC*, 2023 WL 4670954, at *6 (Del. Ch. July 20, 2023) ("In certain instances, an 'option is simply a subsidiary part of a larger transaction' where it 'is not necessary for either the parties or the court to make a separate valuation of the option' for it to be enforceable." (quoting *Walsh*, 2020 WL 1492543, at *5 n.33)); *Walsh*, 2020 WL 1492543, at *5 n.33 ("At common law, an offeror's promise to keep an offer open must be supported by consideration.  But where the option is simply a subsidiary part of a larger transaction, . . . the consideration for the option is seldom a definitely determinable portion of what the option holder gives to the other party.   In that case, it is not necessary for either the parties or the court to make a separate valuation of the option in order that it should be enforceable." (internal quotation marks omitted)).

[67] 3 *Corbin on Contracts* § 11.17 (2023) (noting cases from nearly every state categorize agreements concerning real estate with a purchase/lease extension provision as option contracts).

[68] *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at *30–31 (Del. Ch. Mar. 30, 2017) ("[W]hen the optionee decides to exercise its option, it must act unconditionally and according to the terms of the option . . . .   Nothing less than an unconditional and precise acceptance will suffice unless the optionor waives one or more of the terms of the option . . . .   Because the option itself affords the offeree protection against the offeror's inconsistent action, the general attitude of the courts is to construe the attempt to accept the terms offered under the option strictly." (quoting 1 Richard A. Lord, *Williston on Contracts* § 5:18 (4th ed. 2006) [hereinafter "*Williston on Contracts*"]).

problem of a potential forfeiture [under an option contract] does not enter into the matter."[69] The LPO did just that. Morris expressly "agree[d] and acknowledge[d] that" should he fail to "exercise [the] Purchase Option in strict accord with [its] terms and conditions within the time herein," whatever amount he paid during the lease "shall be retained [by Delmarva] as consideration for this Purchase Option, and neither party shall have any further rights or claims against the other by reason of this Purchase Option."[70]

"When an option contract specifies the time for notice of acceptance, it is almost universally held, in both law and equity, that the stated time is to be regarded as of the essence, whether expressly so stated or not."[71] This is so in Delaware: "time is always of the essence in an option contract" when it provides clear and unambiguous deadlines.[72] The Contract specifies the time for exercising the option:

---

[69] *Id.* at \*31 (first quoting Restatement (Second) of Contracts § 25, Rpt. Note cmt.d (2008); then quoting 1 *Williston on Contracts* § 5:18 (4th ed. 2006)).

[70] LPO § 12.

[71] 3 Corbin on Contracts § 11.17 (2023).

[72] *Greenville Ret. Cmty., L.P. v. Koke*, 1993 WL 328082, at \*5, \*6 (Del. Ch. Aug. 11, 1993) (holding that the "time limits set for the exercise of rights . . . [were] clear and unambiguous" and that it is a "universal rule" that "time is always of the essence in an option contract," regardless of whether it expressly says "time is of the essence"); *Seokoh, Inc. v. Lard-PT, LLC*, 2021 WL 1197593, at \*14 n.179 (Del. Ch. Mar. 30, 2021) ("[E]ven in the absence of a clause making time of the essence, time will generally be regarded as

> This purchase may be exercised on July 1, 2022 and the option must be exercised in writing (with the accompanying down payment) no later than October 31, 2022 . . . .  If Lessee fails to exercise this Purchase Option in strict accord with the terms and conditions herein or within the time provided herein, Lessee agrees and acknowledges . . . neither party shall have any further rights or claims against the other by reason of this Purchase Option.[73]

Time is of the essence in the Contract.

Morris argues that because the LPO does not explicitly state that time is of the essence, he is entitled to reasonable time to exercise the option.  His argument relies on a misreading of *Osborn ex rel. Osborn v. Kemp*.[74]  *Osborn* required "reasonable time" because the single-sentence holographic contract did not set a deadline for exercising the purchase option.[75]  It read in its entirety:  "I, Michael Kemp agree to pay Lucille Menicucci $275.00 per month plus utilities for twenty years for the

---

of the essence in option contracts and in contracts for the sale of property which is subject to rapid fluctuations in value." (quoting 14 *Williston on Contracts* § 43:7 (4th ed. 1993)).

[73] LPO § 12.

[74] Compl. ¶ 9 ("Where time is not of the essence of the contract, reasonable extensions of time for performance of a real estate purchase are permitted and are appropriate." (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1161 (Del. 2010) ("Unless the contract provides that time is of the essence, we will permit the parties a reasonable time to obtain financing and conclude the transaction."))).

[75] *See Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2015 WL 11120934, at *4 (Del. Super. Dec. 29, 2015) ("Under Delaware law, when a contract does not have a deadline or other time specified, the parties have a 'reasonable' amount of time to perform the contract.").

purchase of property at 292 S. Delaware and Bay Ave. Slaughter Beach for $50,000."[76] The Court devoted significant effort in determining whether the contract was even valid, concluding it was.[77] But the contract did not provide a deadline for exercising the purchase option, so the Court inferred a reasonable deadline.[78] *Osborn* does not disturb the conclusion that the LPO's function as an option contract and explicit deadline for exercising the purchase option makes time of the essence.

And so, Morris had the option to purchase the Property only under the LPO's conditions and until its specified time. He did not accomplish the conditions by the October 31 deadline.[79] Nor did he accomplish them by the extended December 31 deadline.[80] Morris did not timely exercise the option.[81]

---

[76] *Osborn*, 991 A.2d at 1156.

[77] *Id.* at 1158–61.

[78] *Id.* at 1161; *see Alchemy*, 2023 WL 4670954, at *5 n.66 ("[T]o the extent the Option provision does not set a deadline . . . , a reasonable deadline for performance can be inferred." (citing *Pivotal Payments*, 2015 WL 11120934, at *4)).

[79] D.I. 20, Ex. 2 at A47–48.

[80] On December 21, Morris's counsel emailed Delmarva indicating Morris would not meet the December 31 deadline and required an "extension of time." D.I. 20, Ex. 1 at A37. And on December 30, Morris's counsel notified Delmarva by letter that Morris filed this action "to protect [his] rights under the contract," indicating Morris would not timely exercise the option. D.I. 20, Ex. 2 at A58.

[81] D.I. 17, Ex. D ("The option expired because [Morris] failed to deliver the written election to purchase with the $10,000 deposit money by [December 31, 2022].").

From there, the option lapsed, and so did Morris's right to purchase the Property. "Respect for the social utility achieved by the legal rule that time is of the essence in option contracts[] requires the conclusion that plaintiff's right to repurchase expired or lapsed" when the lessee failed to exercise the option in the time proscribed.[82] Put another way, "[i]t is rudimentary real estate law that the failure to exercise an option in the time proscribed results in its lapse."[83] If an option lapses, "the option becomes void, and all rights under the contract, along with any consideration given, are forfeit."[84]

It follows that Delmarva had no obligation to keep the option open beyond its proscribed date.[85] Since the option lapsed, Morris "cannot enforce the contract, as

---

[82] *Greenville Ret. Cmty.*, 1993 WL 328082, at *6.

[83] *Id.* at *5 (explaining an optionee's failure to exercise the option within its clear and unambiguous time proscribed "results in its lapse," and the right is extinguished if optionee fails to exercise it by the deadline); *accord Barnes v. Jackson*, 2005 WL 2130220, at *2, *5 (Del. Ch. Aug. 29, 2005) (holding the option expired because the lessee failed to provide timely written notice).

[84] 77 Paul M. Coltoff, *Am. Jur. Vendor* § 44 (2d ed. 2024).

[85] *See Appleby Apartments LP v. Appleby Apartments Assoc., L.P.*, 2023 WL 5620830, at *4 (Del. Ch. Aug. 30, 2023) ("It is fundamental that where the time of performance is expressly made of the essence of a contract, a plaintiff must have performed his part of the contract within the specified time if he is to be entitled to specific performance." (quoting *Morgan v. Wells*, 80 A.2d 504, 506 (Del. Ch. May 3, 1951))); *id.* at *5 ("[The plaintiff] is not seeking specific performance of the Agreement. It is asking the court to rewrite the contract by extending the closing deadline, and then enforce that revised contract. The parties did not bargain for an extension of the closing date . . . . The relief sought by

contractual provisions in option contracts are construed strictly."[86]  The LPO itself says so:  in the event that Morris fails to timely exercise the option, "neither party shall have any further rights or claims against the other by reason of this Purchase Option."[87]  Nothing in the LPO requires Delmarva to extend the option's deadline for Morris; rather, once the option lapsed, Delmarva's obligations thereunder ended. Delmarva's refusal to sell the Property to Morris after the option expired was consistent with the LPO's terms.  Delmarva did not breach any obligation imposed by the Contract.

To avoid this conclusion, Morris argues "although [the LPO is] titled as a lease with a purchase option, [it] is in substance an installment sales contract," referencing the Schedule.[88]  But a contract can be an installment sales contract and

---

Apartments contravenes the time is of the essence clause and is inconsistent with the Agreement's plain terms."); *Simon-Mills*, 2017 WL 1191061, at *36 (holding the plaintiff's inability "to perform [the option] trigger[ed] [defendant's] right to void the [option]"); *see also HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007) ("When time is of the essence in a contract, a failure to perform by the time stated is a material breach of the contract that will discharge the non-breaching party's obligation to perform its side of the bargain.").

[86] *Simon-Mills*, 2017 WL 1191061, at *28.

[87] LPO § 12.

[88] Pl. Mem. 10.

contain a purchase option: the two are not mutually exclusive.[89] The Schedule shows that five years of payments were not enough to purchase the Property.[90] The LPO required an additional payment of $292,092.02. The Schedule and the LPO "clearly indicate[] that [Morris] must remit [$292,092.02] in additional proceeds to 'purchase' the property. This prototypical condition commonly precedes the offeror's performance. Therefore, the ordinary, plain meaning of [the LPO] establishes installment payment[s] with an option to purchase at the end of the term and obtain title."[91] If Morris did not exercise the option and it expired, he agreed "that the full consideration paid to Lessor shall be retained by Lessor as consideration for this purchase option."[92] Morris's argument that the LPO is an installment contract fails to unseat the LPO's purchase option provision and its preconditions.

---

[89] Morris claims the Schedule somehow renders "the final payment" to be "in effect a balloon payment on a mortgage," but this is not found within the four corners of the LPO, and it would render the entire Section 12 of the LPO meaningless or mere surplusage. *Id*. Morris's interpretation is "contrary to the plain meaning of the document." *See Osborn*, 991 A.2d at 1160–61.

[90] LPO, Ex. A.

[91] *Osborn*, 991 A.2d at 1160.

[92] LPO § 12.

> **C.  Delmarva Waived The Deadline And Timeliness Requirement, Then Retracted That Waiver With A New Firm Deadline.**

While Delmarva was under no obligation to offer Morris any accommodation on the deadline, it did offer him an extension from October 31 to December 31, to which Delmarva then held fast.[93]  In granting an extension, Delmarva waived the option contract's timeliness requirement; but by holding the line on December 31, it retracted that waiver.  The retraction was provided with reasonable notice, and so the extension's timeliness requirement was enforceable.

By extending the deadline, Delmarva waived the option's timeliness requirement.[94]  "[B]right line provisions in contracts creating options are universally

---

[93] D.I. 20, Ex. 2 at A49 ("I will stand by my offer thru the end of December but after that I am selling the property."); *see id.* at A56-a ("The option expired . . . .  I graciously gave you . . . more days which I now regret.  But in either case, you either buy baker road by 12-31-22, or you're out.  I'll give you 60 days to leave as long as you pay the rent but the purchase option will not be extended beyond 12-31-22.").

[94] *See* LPO § 12 ("If Lessee fails to exercise this Purchase Option in strict accord with the terms and conditions herein or within the time provided herein, Lessee agrees and acknowledges that the full consideration paid to Lessor shall be retained by Lessor as consideration for this purchase option."); *see Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 27 A.3d 522, 529–30 (Del. 2011) ("[The doctrine] implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those rights . . . .  [T]he facts relied upon must be unequivocal . . . ."); *see also Hastings Funeral Home, Inc. v. Hastings*, 2022 WL 16921785, at *5–6 (Del. Ch. Nov. 14, 2022) (finding defendant waived enforcement of the time period in the option agreement and holding that because of the waiver, plaintiff did not fail to satisfy obligations relating to the option time period).

respected by courts unless the optionor is estopped or has waived the limitation they imply."[95]  "It is well settled in Delaware that a party may waive contractual requirements or conditions."[96]  All three elements of waiver were met:  (1) the October 31 deadline was a requirement capable of being waived; (2) Delmarva knew of that deadline; and (3) Delmarva intended to waive it.[97]

Delmarva retracted its waiver of the purchase option's timeliness requirement by setting a new firm deadline of December 31.[98]  "The waiving party may retract the waiver."[99]  "To be effective, a retraction must be clear and unequivocal and must place [the nonwaiving] party on notice of [the waiving party's] intent to [enforce] . . . the contract in spite of their earlier statements or conduct."[100]  When the waiving

---

[95] *Greenville Ret. Cmty.*, 1993 WL 328082, at *5.

[96] *See Amirsaleh*, 27 A.3d at 529.

[97] *See id.* at 529–30 ("[T]hree elements must be demonstrated to invoke the waiver doctrine:  (1) that there is a requirement or condition capable of being waived, (2) that the waiving party knows of that requirement or condition, and (3) that the waiving party intends to waive that requirement or condition.").

Morris contends Delmarva waived the purchase option's method of payment requirement by telling Morris he could deposit the $10,000 downpayment in the same manner as he deposited rent.  I agree.  But this waiver of the manner of payment shows no intent to waive the deadline.

[98] D.I. 20, Ex. 2 at A49, A53, A55–A56-a; D.I. 20, Ex. 1 at A20.

[99] *Amirsaleh*, 27 A.3d at 530.

[100] *Titan Inv. Fund II, LP v. Freedom Mort. Corp.*, 2012 WL 1415461, at *9 (Del. Super. Mar. 27, 2012) (considering whether an email constituted a valid notice for a retraction of

party gives reasonable notice of its retraction, "the effect . . . is to revive the right,

subject to the doctrine of equitable estoppel."[101]

Morris contends Delmarva did not give Morris enough time before indicating

it intended to enforce the December 31 deadline.[102]  Morris is correct that the notice

---

repudiation and determining it did not, in part, because the defendant removed the retraction by subsequently verbally reaffirming its decision to repudiate), *aff'd in relevant part, rev'd in part*, 58 A.3d 984 (Del. 2012).

[101] *Roam-Tel P'rs v. AT&T Mobility Wireless Operations Hldgs. Inc.*, 2010 WL 5276991, at *9 n.76 (Del. Ch. Dec. 17, 2010).

[102] Pl. Mem. 19 ("Ninety days is a *per se* reasonable standard."); *id.* ("November 15, 2022 is the earliest date a 'final' ultimatum was issued.  It gave Morris 45 days . . . .  [But] [g]iven the length of the contractual relationship . . . , this short-fused — forty-five day— final warning was . . . not reasonable.").

Morris contends Delmarva gave notice that it would once again enforce a firm expiration for the lease term on November 15, but did not give notice it would hold to a December 31 option deadline until December 13.  *Id.* at 20.  But the undisputed facts demonstrate Delmarva began notifying Morris of the December 31 option deadline on October 26.  *See* D.I. 20, Ex. 2 at A49 (showing Gregory texted Morris October 26 saying, "I will stand by my offer through the end of December but after that I am selling the property"); *id.* at A53–54 (showing Gregory texted Morris November 15 saying, "it doesn't look like your banking is working out, so I'll need you to vacate by the end of December"); *id.* at A55–A56-a (showing Gregory texted Morris between November 15 and December 10 saying, "hope you can make this happen by 12-31-22 . . . .  [T]he option expired . . . .  I graciously gave you 90 more days . . . you either buy [the Property] buy [sic] 12-31-22 or you're out.  I'll give you 60 days to leave as long as you pay the rent but the purchase option will not be extended beyond 12-31-22"); D.I. 20, Ex. 1 at A20 (showing Gregory emailed
Morris's counsel on December 6 saying "[t]he purchase option expired at the end of the lease term.  Because Ronnie was actively working through the financing, I extended the option through December 31, 2022 . . . .  [T]he option price . . . is due in full on or before December 31, 2022").  In any event, because the reasonableness of Delmarva's decision to

of the retraction must be reasonable.  But the reasonableness of notice of a retraction is measured by "material change [in] position . . . in reliance on the waiver," not by time.[103]  A retraction is performed with reasonable notice if the other party has not "suffered prejudice or materially changed his position" in reliance on the retracted waiver.[104]

Morris has offered no facts showing he materially changed his position in reliance on the deadline waiver before Delmarva retracted it.  As early as July 2022, Morris was pursuing financing for exercising the purchase option.[105]  His pursuit continued, and Gregory extended the original purchase option deadline because

---

enforce a deadline is measured not by days, but against Morris's reliance, the exact date does not matter.

[103] *Amirsaleh*, 27 A.3d at 530 n.30 (quoting 13 *Williston on Contracts* § 5:16 (4th ed. 2024)); *accord Roam-Tel P'rs*, 2010 WL 5276991, at *9 n.77 ("[O]ur courts are willing to allow a waiving party to change her mind in the absence of such detrimental reliance or other prejudice." (citing *Bailey v. State*, 525 A.2d 582 (Del. 1987))); *id.* ("[W]here the requirement of a condition is waived in advance, the promisor may reinstate the requirement by giving notice to the other party before the latter has materially changed his position.  Whether delay alone makes reinstatement unjust depends upon the circumstances . . . ."  (quoting Restatement (Second) of Contracts § 84 cmt. f)); *see Bailey v. State*, 1987 WL 37178, at *2 (Del. 1987) ("[I]t does not appear that the State has changed position or suffered specific prejudice as a result of defendant's attempted withdrawal of the waiver.").

[104] *Amirsaleh*, 27 A.3d at 530 n.30.

[105] D.I. 20, Ex. 2 at A43–44.

"[Morris] was actively working through the financing."[106]  Morris kept working toward financing.[107]  As of December 13, when Morris contends Delmarva gave notice it would hold the December 31 deadline, Morris was still pursuing financing, and had not yet signed a loan agreement or engaged counsel for closing.[108]

In the absence of any detrimental reliance by Morris, Delmarva validly retracted the timeliness waiver for the October deadline by giving reasonable notice of a new firm deadline.[109]  Delmarva made clear, early and often, that it would require strict adherence to the December 31 deadline.  Morris's position remained unchanged.  Time was of the essence for the option's extended December 31 deadline.

---

[106] D.I. 20, Ex. 1 at A20.

[107] *Id.* at A21 (indicating Morris was in active communication with a lender, who sought additional information for underwriting purposes); *see also* D.I. 20, Ex. 2 at A56 (indicating Morris obtained proof of rental payments to satisfy the lender).

[108] D.I. 20, Ex. 1 at A33; *see id.* at A34.

[109] D.I. 20, Ex. 2 at A 49 ("I will mail you an official notice, but I'm not willing to go last [sic] December on this.").

### D. Morris Finds No Relief In The Doctrine Of Repudiation Or The Delaware Code.

Morris asserts Delmarva repudiated the Contract by refusing to adjust the December 31 deadline after Morris obtained preapproval on December 14.[110] "A party repudiates a contract when it takes an action that constitutes a significant and substantial alteration of both the present and the reasonably anticipated future relations created by [the] agreement."[111] Delmarva did not repudiate the LPO or in any way alter the relations it created by holding fast to the December 31 deadline. Rather, Delmarva performed under the expectations of an option contract, which lapses if not exercised in compliance with strict conditions.

Morris also claims Delmarva's adherence to the December 31 deadline frustrated a statutory right to exercise the option after December 31.[112] Morris refers to Title 25, Sections 314(d)(2) and 5106 of the Delaware Code.[113] Neither of these statutes requires Delmarva to extend the purchase option. Section 314(d)(2) pertains

---

[110] Pl. Mem. 17.

[111] *Moscowitz v. Theory Ent. LLC*, 2020 WL 6304899, at *26 (Del. Ch. Oct. 28, 2020) (quoting *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1014 (Del. Ch. June 21, 2004)).

[112] *See* Pl. Mem. 20–21.

[113] 25 *Del. C.* §§ 314, 5106.

to conditional sales agreements; but the agreement at issue is a lease with purchase option, not a conditional sales agreement.[114]  Section 5106 requires that a landlord give a tenant sixty-day's notice before termination of the lease takes effect; it does not extend option deadlines.[115]  That sixty-day requirement would apply to Morris as a lessee, but is irrelevant to his purchase option.[116]  And Delmarva made clear that Morris could extend his lease until February 28, 2023, well within sixty days of even October 26.[117]

---

[114] 25 Del. C. § 314(d)(2) ("[T]he parties may agree under the contract of sale to not engage in a final settlement until fulfillment of a condition of paying the last installment of the purchase price under a conditional sale, provided that the conditional sales agreement includes provisions indicating:  . . . (2) In the event of buyer or buyers default for failure to pay, the buyer or buyers have a right to redeem the property by making full payment of the remaining contract amount within 120 days of the seller or sellers providing written notice of the default."); see 175 A.L.R. 1366 (distinguishing lease agreements from conditional sales agreements and explaining "whether the contract is one of conditional sale or a lease is whether or not the party is obligated at all events to pay the total purchase price of the subject of the contract.  If return of the property is either required or permitted the instrument will be held to be a lease; while, on the other hand, if the so-called lessee is obligated to pay the purchase price, even though such price is designated as rental or hire, the contract will be held to be one of sale . . . .").

[115] *See generally* 25 *Del. C*. § 5106.

[116] *Barnes*, 2005 WL 2130220, at *4 ("While a lessor may be content for a fixed time to be restricted to a fixed price for the sale of his property, it is another matter altogether to conclude that an option to purchase is to continue for an indefinite period under the authority of a 'hold-over' tenancy.").

[117] *See*, *e.g.*, D.I. 17, Ex. C.

### E. Morris Has Not Demonstrated Delmarva Frustrated His Exercise Of The Option.

Finally, Morris argues Delmarva's refusal to give a clean payment history to his lender "interfere[d] with Morris's financing application," asserting that "to the extent there was any delay in Morris obtaining financing, Delmarva unjustly contributed to it."[118] Morris made this argument for the first time in reply, so I will make quick work of it.[119] Morris plugs this contention into three doctrines, none of which aids his cause. First, he concludes that "Delmarva lacks clean hands."[120] But the unclean hands doctrine is an equitable defense that operates to bar a complainant's equitable relief; it does not support a cause of action.[121] Second,

---

[118] Pl. Reply at 6; *see* Pl. Mem. 17 ("Morris ran into unexpected complications arising from verifying the payment in the agreement. Delmarva was anything but helpful.").

[119] *Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *4 (Del. Ch. Oct. 19, 2006) ("[A] party is obliged in its motion and opening brief to set forth all the grounds, authorities, and arguments supporting its motion. A movant should not hold matters in reserve for reply briefs. Instead, reply briefs should consist of material necessary to respond to the answering brief."); *Thor Merritt Square, LLC v. Bayview Malls LLC*, 2010 WL 972776, at *5 (Del. Ch. Mar. 5, 2010) ("[C]ourts routinely have refused to consider arguments made in reply briefs that go beyond responding to arguments raised in a preceding answering brief . . . . Accordingly, based on its belated assertion, I find that Defendants have waived this argument . . . .").

[120] Pl. Reply at 6 (citing *Cook v. Fusselman*, 300 A.2d 246, 251–52 (Del. Ch. Dec. 8, 1972) (denying specific performance when the party who seeks equity comes to the court with "unclean hands")).

[121] *See*, *e.g.*, *Am. Healthcare Admin. Servs., Inc. v. Azien*, 285 A.3d 461, 492 n.13 (Del. Ch. Nov. 18, 2022) ("It (the doctrine of unclean hands) is a rule that lays restrictions upon

Morris argues this fact tilts the balance of the equities in his favor. This argument might aid his pursuit of specific performance, but it does not bolster his underlying breach of contract claim.[122]

Third, Morris cites *Old Time Petroleum Company v. Turcol* for the proposition that "[d]enying a buyer the opportunity to specifically perform a partially performed contract works an inequitable forfeiture of their reasonable expectations and interests."[123] Nothing in the factual record indicates Delmarva's conduct approximates the lessor's conduct in that case, where the lessor caused the lessee's forfeiture of the accompanying lease agreement in the interest of "destroying the tenant's right to enjoy the option privilege to purchase."[124] Indeed, the undisputed facts do not demonstrate Delmarva frustrated Morris's lease agreement or his ability to exercise the option. Morris's lender requested

---

complainants and tells them that an appeal for relief to a court of conscience will not be honored by one who has himself been guilty of unconscionable conduct." (quoting *Elec. Rsch. Prods. v. Vitaphone Corp.*, 171 A. 738, 749 (Del. 1934))).

[122] *See In re Aerojet Rocketdyne Hldgs., Inc.*, 2022 WL 2180240, at *20 (Del. Ch. June 16, 2022) (noting a "party may not assert an equitable defense against a purely legal claim, even when the legal claim is pending in a court of equity").

[123] *See* Pl. Mem. 10 (citing *Old Time Petroleum Co. v. Turcol*, 156 A. 501 (Del. Ch. July 9, 1931)).

[124] *Old Time Petroleum*, 156 A. at 505.

verification from Gregory of Morris's monthly payments.[125]   Morris's counsel notified Gregory of this request and explained it was for "underwriting purposes."[126] Gregory refused to help, asserting "[Morris's] numerous late payments" made it impossible for him to "reconstruct [anything that] would present a favorable picture."[127]  But six months earlier, Gregory had verified that from August 2017 until May 10, 2022, Morris had never made a late payment.[128]

Even assuming Gregory's refusal was unreasonable, Morris has not established that refusal frustrated his ability to receive financing before the purchase option expired.[129]  Gregory refused to verify Morris's payments on December 6; on December 10, Morris shared with Gregory that he "need[ed] proof [he] paid [Gregory] the past 64 months, so [he] ordered 5 ye[ar]s on [his] canceled checks."[130]

---

[125] *See*, *e.g.*, D.I. 20, Ex. 1 at A21.

[126] *Id.*

[127] *Id.* at A25.

[128] *Id.* at A13.

[129] *See Nationwide Mut. Ins. Co. v. Flagg*, 789 A.2d 586, 591–92 (Del. Super. July 3, 2001) ("If it appears that there is any reasonable hypothesis by which the non-moving party might recover, the motion for summary judgment will be denied.").

[130] D.I. 20, Ex. 2 at A56.

Just days after Gregory's refusal, Morris found a way to verify his lease payments.[131]

But Morris was still unable to obtain financing; while he received preapproval on December 14, he was still working towards a commitment as of December 30.[132]

As of the time of his July 2023 Motion, Morris still "require[d] additional . . . time to secure financing."[133]  Morris has not established that Gregory's refusal to provide a history of timely payments is what impeded Morris from obtaining financing by December 31.

### III.    CONCLUSION

The LPO offered Morris a purchase option in which time was of the essence; Delmarva waived that restriction but retracted that waiver in reinstating a firm extension; and Delmarva's insistence on the new deadline was in keeping with the LPO, not in breach or repudiation of it.  Morris has not established that Delmarva's refusal to give his lender a clean payment history caused Morris's inability to finalize

---

[131] *See id.*; *id.* at Ex. 1 at A30 ("My client is now reconstructing 5 years of payment records to satisfy the 'underwriting requirements.'").

[132] D.I. 20, Ex. 1 at A34; Compl. ¶ 7.

[133] Pl. Mem. 4.

the financing by the deadline.[134]   Delmarva's motion for summary judgment is granted, and Morris's is denied.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc:  All Counsel of Record, via *File & ServeXpress*

---

[134] *But see* Pl. Reply at 6 (citing D.I. 20, Ex. 1, at A13, A25).